1   GREENFIELD & GOODMAN, LLC
    Richard D. Greenfield
2   whitehatrdg@earthlink.net
    Ilene Freier Brookler (SB No. 269422)
3   ibrookler@gmail.com
    250 Hudson Street-8th Floor
4   New York, New York 10013
    Telephone: (917) 495-4446
5
    CUNEO GILBERT & LADUCA LLP
6   Michael J. Flannery (SB No. 196266)
    mflannery@cuneolaw.com
7   300 North Tucker Boulevard, No. 801
    St. Louis, MO 63101
8   Telephone: (202) 789-3960
    *Attorneys for Plaintiff*
9
    (Additional Counsel on Signature Page)
10

FILED
2012 OCT 25  PM 2: 39
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY

11            **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

13  WILLIAM A. SOKOLOWSKI,                )    SACV12-1862 DOC(MLGx)
    individually and derivatively on behalf )
14  of STEC, INC.,                         )    Case No. 12-civ-_____
                                           )
15                    Plaintiff,           )
                                           )
16           vs.                           )
                                           )    **COMPLAINT**
17  MANOUCHEHR MOSHAYEDI,                  )    **FOR VIOLATION OF THE**
    MEHRDAD MOSHAYEDI,                     )    **FEDERAL SECURITIES**
18  RAYMOND D. COOK, RAJAT                 )    **LAWS, BREACH OF**
    BAHRI, ROBERT M. SAMAN,                )    **FIDUCIARY DUTY, BREACH**
18  MASOUD MOSHAYEDI, DAN                  )    **OF DUTY OF LOYALTY,**
    MOSES, F. MICHAEL BALL,                )    **TRADING ON INSIDE**
19  MATTHEW WITTE, CHRISTOPHER             )    **INFORMATION, WASTE OF**
20  COLPITTS, ROBERT M. SAMAN,             )    **CORPORATE ASSETS,**
    MEHRDAD MOSHAYEDI TRUST,               )    **UNJUST ENRICHMENT, and**
21  MANOUCH MOSHAYEDI TRUST                )    **VIOLATIONS OF**
    and MASOUD MOSHAYEDI                   )    **CALIFORNIA**
22  TRUST,                                 )    **CORPORATIONS CODE**
                                           )
23                    Defendants           )
                                           )    **DEMAND FOR JURY TRIAL**
24           and                           )
                                           )
25  STEC INC., a California Corporation,   )
                                           )
26           Nominal Defendant.            )

27

28

1          Plaintiff William A. Sokolowski, by his undersigned counsel, alleges the

2    following upon personal knowledge as to himself and his own acts, and upon

3    information and belief as to all other matters.[1]  Plaintiff's information and belief as

4    to allegations concerning matters other than himself and his own acts is based upon

5    an investigation by his counsel, which included, among other things (i) review of

6    documents filed publicly by STEC with the Securities and Exchange Commission

7    (the "SEC"); (ii) review and analysis of press releases, news articles, earnings

8    conference call transcripts and other public statements issued by or concerning

9    STEC; (iii) review and analysis of research reports issued by financial analysts

10   concerning STEC's securities and business; (v) review and analysis of news

11   articles, media reports and other publications concerning the computer industry;

12   (vi) review of the Court's orders and other documents filed of record in *In re*

13   *STEC, Inc., Securities Litigation*, No. SACV 09-0103-JVS (MLGx)  (C.D.

14   Cal.)("Securities Litigation")[2] and (vii) review of the SEC's Complaint in

15   *Securities and Exchange Commission v. Manouchehr Moshayedi*, Case No.

16   SACV12-1179 JST (MLGx) (C.D. Cal.) (the "SEC Litigation"). Plaintiff believes

17   that substantial additional evidentiary support for the allegations herein exists and

18   will continue to be revealed after he has a reasonable opportunity for discovery.

19          1.     Plaintiff brings this action individually, asserting claims for violation

20   of the federal securities laws against Defendant Raymond D. Cook ("Cook"), Rajat

21   Bahri ("Bahri"), Manouchehr Moshayedi ("Manouchehr") and Mehrdad

22

23

24

25   [1] The three Moshayedi family trusts are the respective alter egos of the three
     Moyasheedi brothers and their knowledge is imputed to such Trusts and vice-versa
     (the "Trust Defendants").

26   [2] Because of the substantial efforts put into drafting the Complaints in the SEC and
     Securities Litigation, Plaintiff has utilized and quoted directly certain allegations

27   from, *inter alia*, the Complaint in the SEC Litigation and the Second Consolidated
     Amended Complaint in the Securities Litigation, both of which are incorporated

28   herein by reference.

1   Moshayedi ("Mark")[3] (the "Securities Fraud Defendants"), each of whom was a

2   senior officer and/or director of STEC, Inc. ("STEC" or "the Company"). Plaintiff

3   also brings claims derivatively, on behalf of the Company, against the Securities

4   Fraud Defendants and the remainder of STEC's Board of Directors and General

5   Counsel during the period of the wrongdoing alleged herein including at the time

6   the Board purportedly "investigated" Plaintiff's pre-suit demands. Such derivative

7   claims on behalf of STEC are based upon, *inter alia*, the breach of fiduciary duty,

8   breach of duty of loyalty, violation of California Corporations Code §25402, waste

9   of corporate assets, and unjust enrichment against all of the Securities Fraud

10  Defendants, Trust Defendants and the remaining Individual Defendants.

11      2.      This action involves insider trading on a massive scale as part of a

12  fraudulent scheme perpetrated by Defendants Manouchehr and Mark on behalf of

13  themselves, their brother Mike and the Moshayedi family trusts to deceive the

14  investing public by making materially false and misleading statements regarding

15  the true financial and operating condition of STEC, and by intentionally concealing

16  material facts concerning the Company's violations of, *inter alia,* SEC rules and

17  accounting principles, all of which caused STEC's reported revenue and profits to

18  be overstated artificially and by material amounts. The Company's auditor,

19  PriceWaterhouseCoopers, LLP ("PWC"), although not a defendant, added its

20  imprimatur to the Company's year-end financial statements when it knew or

21  should have known that they were false and misleading.   Indeed, PWC had

22  knowledge of the actual financial and operating condition of STEC as well as

23  industry practices. Despite knowing that the Securities Fraud Defendants had

24  manipulated the Company's revenue recognition practices and had actual

25  knowledge from "red flags" and specific facts at its disposal demonstrating that

26

27  [3] Defendants Manouchehr and Mark are sued herein individually, as agents and
    representatives for their brother, Masoud Moshayedi ("Mike") and three

28  Moshayedi family trusts, *de facto* controlled by the respective Moshayedi brothers.

1    STEC's year-end financial statements were not prepared in accordance with

2    Generally Accepted Accounting Principles ("GAAP"), it rendered its opinions

3    otherwise. Indeed, its audits of such statements were not conducted in accordance

4    with GAAS as it had represented. At all times relevant, the Securities Fraud

5    Defendants knew or should have known the material facts that STEC's financial

6    statements were not prepared in conformity with GAAP and that PWC's audits of

7    them were not prepared in conformity with GAAS.[4]

8    **I.    NATURE AND SUMMARY OF THE ACTION**

9         3.    As detailed below, this case arises principally from the conduct of two

10   brothers, Defendants Manouchehr and Mark Moshayedi who, as co-founders of the

11   Company with a third brother, Mike, and key officers of the Company, using and

12   appropriating to themselves STEC's proprietary information not available to the

13   public, sold half of their stock in the Company for $267.8 million in a secondary

14   offering (the "Offering") after they and one of the other senior officers, Defendant

15   Cook, had made a series of knowing misstatements and misleading omissions,

16   including artificially manipulating the Company's reported revenues and earnings,

17   that artificially doubled the price of STEC stock and/or otherwise kept it at

18   artificially high prices which were unjustified given STEC's true financial and

19   operating condition.

20        4.    Subsequent to the Moshayedi brothers' sale of their stock in the

21   Offering in August 2009 and otherwise during 2009, as the falsity of their

22   statements and omissions ultimately became known, the price of the Company's

23   stock collapsed causing Plaintiff significant damages.

24        5.    On July 19, 2012, after the SEC commenced a formal investigation, it

25   commenced suit against Defendant Manouchehr based upon, *inter alia*, his

26

27   _____
     [4] The Securities Fraud Defendants typically spoke through Defendant Manouchehr
28   and all of them were controlling persons with respect to the Company's filings
     with the SEC, press releases and other disseminations to the public.

1    violations of the federal securities laws.

2        6.    Upon information and belief, although he was not an officer or

3    director of the Company during the Relevant Period, upon information and belief,

4    Defendants Manouchehr and Mark shared with their brother Mike material inside,

5    proprietary information which he appropriated and, thereafter, sold directly and/or

6    indirectly more than one million of his STEC shares to an unsuspecting public in

7    addition to the shares sold by his brothers through their respective Trusts in the

8    Offering and otherwise.

9        7.    Compounding their individual wrongdoing as set forth herein, the

10   STEC Board and, in particular, its Compensation Committee consisting of

11   Defendants Ball, Bahri and Witte, caused STEC to pay out bonuses for 2009 to

12   Defendants Manouchehr, Mark and Cook in the amounts of $772,500, $273,000

13   and $150,000, respectively, purportedly because they "achieved all of their

14   performance objectives" in 2009. Such bonuses were wholly unjustified and a

15   waste of the Company's assets since the members of the Compensation

16   Committee, indeed each members of STEC's Board, knew and did not disclose

17   that Defendants Manouchehr, Mark and Cook had each actively manipulated the

18   Company's earnings and projections and otherwise deceived the investing public

19   in substantial part, to facilitate the Moshayedi brothers' ability to unload massive

20   amounts of their STEC stockholdings (directly and through the Trust Defendants

21   controlled by them) at artificially high prices.

22       8.    This is an action brought by the Plaintiff, who purchased 5,000 shares

23   of STEC common stock during the period of the wrongdoing alleged herein and

24   who has owned STEC shares continuously through the present, against the

25   Securities Fraud Defendants to recover his damages from them. This action is also

26   brought by Plaintiff derivatively on behalf of STEC to recover for it the damages

27   caused by and unjust enrichment of the Securities Fraud Defendants, Mike, the

28   members of the Board and the Moshayedi family trusts including, *inter alia*, the

1   failure of STEC's Board of Directors (the "Board") to sue the Securities Fraud
2   Defendants, Mike and PWC following Plaintiff's August 2, 2010 pre-suit written
3   demand (the "Demand Letter") that they do so, which letter is attached hereto as
4   Exhibit "A".

5       9.      The claims made in the Demand Letter were, as described more fully
6   below, subjected to a sham "investigation" by so-called "independent members of
7   the Board" orchestrated by Defendant Robert M. Saman, STEC's in-house counsel
8   ("Saman"), and ultimately rejected.[5]  Such "investigation" and its resultant
9   rejection of the demands were scripted by Defendant Saman at the direction of
10  Defendants Manouchehr and Mark, to whom Defendant Saman reported and was
11  subservient.

12      10.     In the wake of such bad faith rejection of Plaintiff's demands and
13  refusal to commence suit against the Individual Defendants and the Trust
14  Defendants to recover STEC's damages, he asserts herein claims on behalf of
15  STEC.[6] These claims arise from, *inter alia*, the Individual Defendants' breaches of
16  fiduciary duty, breaches of the duty of loyalty, violation of California Corporations
17  Code §25402, waste of corporate assets, and/or unjust enrichment (including
18  trading on inside information) and against Defendant Mike and the Moshayedi
19  Trust Defendants for unjust enrichment (including trading on inside information).
20  Plaintiff seeks further damages on behalf of STEC from the Securities Fraud

21

22  [5] Upon information and belief, the purportedly "independent members of the
23  Board" did not even have independent legal counsel in "determining the
    appropriate action to be taken with respect to the Demand" Letter and were guided
24  solely by Defendant Saman, who was appointed by, reporting to and serving at the
    pleasure of the Moshayedis.
25  [6] The Demand Letter asserts claims directly and/or indirectly by implication
    against each of the Individual Defendants and Trust Defendants. To the extent that
26  the Demand Letter did not specifically identify each potential Defendant by name
    and precise wrongful activity, give the wholesale rejection of the demands
27  contained in the Demand Letter and the manner in which these claims were
    handled by Defendants Saman and Manouchehr, any further identification of the
28  Individual Defendants and/or particularization of their wrongful acts would have
    been futile gestures and, thus, unnecessary.

6

Defendants to the extent that their violation of the federal securities laws has led to investors who purchased the Company's stock between June 16, 2009 and February 23, 2010 (the "Relevant Period") to sue STEC for their damages, causing the Company substantial defense and reputational expenses as well as the eventual cost of resolving such claims as well as related expenses caused by the SEC's investigations of the Company and the Moshayedis.

11.     During the Relevant Period, STEC was a manufacturer of data storage devices for computer systems.  STEC's customers included original equipment manufacturers ("OEMs") such as EMC, IBM, Hitachi, Hewlett-Packard ("HP") and Sun Microsystems ("Sun"), who, in turn, manufactured high performance storage and server systems for large enterprises.

12.     STEC claimed that it manufactured the industry's most comprehensive line of solid-state drives ("SSDs," also known as "flash drives").  A solid state drive is used for storing information in a computer system.  Whereas older hard disk drive ("HDD") technologies stored information on electromechanical spinning disks, an SSD has no moving parts, but instead retains information on static computer chips.  Because SSDs have no moving parts, they have certain performance advantages over HDDs; they are faster, more energy efficient and have longer service lives.  However, SSDs are significantly more expensive than HDDs.

13.     STEC's flagship product, the ZeusIOPS, was, during the Relevant Period, a high-performance SSD advertised by the Company as being able to access stored data at much faster speeds than both HDDS and other SSDs, due to the Company's proprietary architecture.

14.     The Company was founded by the three Moshayedi brothers in 1990.  Thereafter, the Moshayedis continued as STEC senior officers and directors.  At all relevant times, Defendant Manouchehr was STEC's Chief Executive Officer ("CEO") and Chairman of the Company's Board of Directors.  At all relevant

1    times, Defendant Mark was the Company's Chief Operating Officer ("COO"),

2    Chief Technical Officer ("CTO"), President and Secretary, as well as a member of

3    STEC's Board of Directors and Equity Awards Committee. Defendant Mike,

4    formerly the Company's President, retired in 2007, but retained at that time an

5    8.99% ownership interest in the Company and was kept by his brothers fully

6    informed as to STEC's true financial and operating condition including "inside

7    information" not available to the public at large. Mike is a Defendant solely with

8    respect to the claims asserted derivatively on behalf of STEC.

9        15.    The Moshayedis are also the controlling shareholders of the Company

10   and were, at all relevant times, "control persons" of STEC under and pursuant to

11   §20 of the Exchange Act. At the beginning of and before the Relevant Period, they

12   collectively held at least 45% of the Company's stock (and, together with Mike,

13   over 50%) and caused the appointment of all of the members of STEC's Board of

14   Directors and determined their compensation in the form of directors' fees, stock

15   options and otherwise. In addition, together with the members of the Board, they

16   were all "control persons" with respect to STEC's Registration Statements and

17   other documents filed with the SEC in 2009 and later, as well as other documents

18   disseminated to the public before and during the Relevant Period.

19       16.    As detailed herein, before and during the Relevant Period, the

20   Securities Fraud Defendants issued or caused to be issued materially untrue

21   statements and omissions in the name of the Company that, among other things,

22   overstated the revenues and earnings of STEC by material amounts, created an

23   inflated impression of STEC's revenue growth and with respect to conditions that

24   supposedly assured a near and long term continuation and even acceleration of that

25   growth.

26       17.    In summary, these materially untrue statements and omissions

27   included:

28           (a) a misrepresentation that an agreement signed by STEC with its

8

largest customer, EMC, in the middle of 2009 for a huge volume of purchases to be made in the second half of 2009 (the "EMC Agreement" or "Agreement") was an ordinary course contract whose size was determined solely by an increase in the customer's supply requirements such that a similar volume of purchases by the same customer could be expected on a regular recurring basis;

(b)  a misrepresentation that, as of August 2009, STEC was expecting the volume of purchases by its other large customers (the "Other OEMs") to increase during the second half of 2009;

(c)  a misrepresentation that, as part of the expected increase in purchases by the Other OEMs during the second half of 2009, STEC was expecting IBM to transition to a much larger volume of purchases during that period;

(d)  a misrepresentation that, as of September 2009, one or more of the Other OEMs would have been willing and able to replace EMC as the purchaser under the EMC Agreement, or to purchase a similar amount of ZeusIOPS under a similar agreement;

(e)  the failure to disclose that, during the 2009 second quarter, STEC's reported revenue would grow, and then did grow, by an amount that – unknown to investors – had been artificially inflated; and

(f) the failure to disclose that STEC's year-end and quarterly financial statements were materially deceptive and false due to, *inter alia*, the Securities Fraud Defendants' manipulative revenue recognition practices which resulted in the Company's reported revenue and earnings to be overstated by material amounts.

18.     The effect of these false statements and omissions was to inflate the price of STEC's stock dramatically before and during the Relevant Period,

1    particularly during the second and third quarters of 2009.  On June 15, 2009, the

2    already manipulated price of STEC stock closed at $18.02.  By August 3, 2009,

3    because of the Officer/Director Defendants' more recent false and misleading

4    statements, the market price for STEC shares had roughly doubled, to $35.50.

5        19.    On August 3, 2009, when the false impression created by the

6    Securities Fraud Defendants' more recent misstatements and omissions had

7    resulted in the doubling of STEC's stock price, STEC was caused by them to

8    announce that it would proceed with a secondary public offering of the Company's

9    stock, comprised entirely of stock held personally by Defendants Manouchehr and

10   Mark.  Each of the Securities Fraud Defendants made or caused to be made false

11   statements and omissions of material facts as alleged herein including causing to

12   be filed with the SEC Registration Statements on Form S-3 signed personally (or

13   authorized others to sign) by each of such Securities Fraud Defendants and

14   intentionally failing to submit material documents as exhibits thereto with

15   knowledge that such omissions would deceive the investing public.

16       20.    Eight days later, on August 11, 2009, Defendants Manouchehr and

17   Mark sold more than 50% of their holdings of STEC stock in the Offering, and

18   received thereby a total of $267.8 million. In breach of their duty of loyalty to

19   STEC and its shareholders, the other Officer/Director Defendants on the

20   Company's Board put their obeisance to the Moshayedis first and not only signed

21   the material documents that allowed the Offering to take place but actively

22   supported it.

23       21.    The Offering was the biggest insider stock liquidation in the history of

24   STEC, and a departure from the pattern of the Moshayedis' other recent sales of

25   STEC stock.[7]  Excluding the STEC shares sold separately by Defendant Mike, the

26

27   ――――――――――――――――
     [7] Such shares were sold by them and/or the Trust Defendants. At all times relevant

28   herein, each of the Moshayedi brothers controlled the Trust Defendants in their
     respective names.

1  number of shares sold by the Moshayedis in the Offering was collectively more

2  than eleven times the number of shares they sold in the six months before the

3  Relevant Period and nearly twenty times the number of shares they sold in all of

4  2008.

5      22.   Seven months later, as the price of STEC's stock was hitting a new

6  low, the Company announced that the SEC was conducting a formal investigation

7  involving trading in the Company's securities, and that the SEC had issued

8  subpoenas to certain of its employees in connection with that investigation,

9  including two of the Company's top officers: Defendant Manouchehr, the

10  Company's CEO, and Defendant Mark, the Company's' President and COO.

11      23.   (a) Under Counts I and II, which Plaintiff brings under and pursuant

12  to the Exchange Act, Plaintiff alleges that each of the Securities Fraud

13  Defendants violated the anti-fraud provisions of the federal securities

14  laws by making one or more of the alleged materially untrue

15  statements and/or omitting material facts with regard to STEC and its

16  business in the connection with the Offering and otherwise and by

17  doing so with knowledge of the falsity of each such misstatements or

18  omissions.

19     (b) Under the remaining Counts, which Plaintiff brings derivatively

20  under California state law and the common law on behalf of STEC,

21  Plaintiff alleges that each of the Individual Defendants is liable

22  personally for, *inter alia*, breach of fiduciary duty, breach of the duty

23  of loyalty, violation of California Corporations Code §25402, waste of

24  corporate assets, violation of the federal securities laws and/or unjust

25  enrichment by acting as alleged herein. Plaintiff also alleges that

26  Defendants Manouchehr, Mark, Mike and the Trust Defendants

27  appropriated for themselves material inside information belonging to

28  STEC during the period when its stock prices had been artificially

1    manipulated and that they availed themselves of such information and

2    unjustly enriched themselves by, *inter alia,* Mike's sale of over one

3    million of his STEC shareholdings in June and July, 2009, the sale by

4    Manouchehr and Mark of millions of additional shares through the

5    Trust Defendants in the Offering and otherwise and that, as a result

6    thereof, they are liable personally therefor to STEC.

7 **II.  JURISDICTION AND VENUE**

8    24.  This Court has jurisdiction over the subject matter of this action

9 pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§

10 1331, 1332, and 1367. There is also supplemental and diversity jurisdiction over

11 the claims brought derivatively.

12    25.  Plaintiff is a citizen of the State of New Jersey and each of the

13 Defendants is a citizen of the State of California or states other than New Jersey.

14 The amount in dispute exceeds $75,000, exclusive of interest and costs.

15 Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

16 U.S.C. § 78aa, 28 U.S.C. § 139(b) and 28 U.S.C. § 1391.  Defendant STEC

17 maintains it principal place of business within this District, the Officer/Director

18 Defendants conducted business in this District and many of the acts giving rise to

19 the violations alleged herein, including the preparation and dissemination of

20 materially false and misleading information and omissions of material facts,

21 occurred in substantial part in this District.

22    26.  In connection with the acts alleged herein, the Individual Defendants

23 and Trust Defendants, directly or indirectly, used the means and instrumentalities

24 of interstate commerce including, without limitation, the United States mail,

25 interstate telephone communications and the facilities of the national securities

26 markets.

27

28

## III.   THE PARTIES

### A.   Plaintiff

27.   Plaintiff William A. Sokolowski is an individual who, among other transactions in the Company's shares, purchased 5,000 shares of STEC common stock on September 16 and September 17, 2009, during the Relevant Period, suffering substantial damages as a direct and proximate result of the Securities Fraud Defendants' wrongful conduct alleged herein. Since his initial purchase, he has owned STEC shares continuously through the date of this Complaint.  The wrongful acts committed by the Defendants were part of a continuing wrong that commenced prior to Plaintiff's initial purchase of STEC securities and continued thereafter.  Plaintiff acquired STEC shares "before there was disclosure to the public or to the plaintiff of the wrongdoing of which plaintiff complains." Cal. Corp. Code § 800(b)(1).

### B.   The Nominal Defendant

28.   Nominal Defendant STEC is a California corporation with its principal place of business located at 3001 Daimler Street, Santa Ana, California. STEC purported to be a leading global provider of solid-state computer memory drive technologies and solutions tailored to meet the high-performance, high-reliability needs of OEMs, such as EMC, IBM, HP, Hitachi and Sun.  During the Relevant Period, STEC's core business was its enterprise scale SSDs, such as the ZeusIOPS.  STEC claimed to manufacture the "most comprehensive line" of SSDs in the storage industry.   STEC is a nominal defendant only and no claims for damages are asserted against it.

29.   Defendants Manouchehr and Mark Moshayedi and their brother, Mike Moshayedi founded STEC, then named Simple Technology, Inc., in 1990. The Company grew rapidly through acquisitions and expansion both domestically and abroad.  In September 2000, the Company went public.  In 2007, STEC divested its Consumer Division, and introduced its high-end, flagship product, the

13

1    ZeusIOPS.

2        30.    Throughout the Relevant Period, the Company's stock traded in an

3    efficient market on NASDAQ under the ticker symbol, "STEC."  As of August 24,

4    2012, the Company had nearly 47 million shares of common stock outstanding.

5        **C.    The Individual Defendants**

6        31.    (a) At all relevant times Defendant Manouchehr was CEO, Chairman

7               of STEC's Board of Directors and a member of the Equity Awards

8               Committee.  During the Relevant Period, Defendant Manouchehr

9               signed and certified STEC's SEC filings pursuant to Sections 302 and

10              906 of the Sarbanes-Oxley Act of 2002, including, without limitation,

11              the Company's quarterly report for the second quarter of 2009  and

12              STEC's 2009 Form 10-K Annual Report.  He also signed documents

13              integral to the Offering, including the STEC Registration Statement

14              on Form S-3 and the Prospectus contained in the Registration

15              Statement.  Defendant Manouchehr sold 4.1 million shares of his

16              STEC common stock for $133,920,000 in the Offering.

17              (b) At all relevant times, Defendant Mark was STEC's President, COO,

18              CTO, and Secretary, as well as a member of the Company's Board of

19              Directors and a member of the Equity Awards Committee.  During the

20              Relevant Period, Defendant Mark signed STEC's SEC filings,

21              including, without limitation, documents integral to the Offering

22              including the Registration Statements, and the 2009 Form 10-K Annual

23              Report.  Defendant Mark sold 4.1 million shares of his STEC common

24              stock for $133,920,999 in the Offering.

25              (c) Defendant Cook was first hired by STEC in November 2008.  At all

26              times during the Relevant Period, he was STEC's Chief Financial

27              Officer ("CFO") and Principal Accounting Officer.  Defendant Cook

28              signed STEC's SEC filings during the Relevant Period, including

14

1    without limitation, its Registration Statements, the 2009 second quarter

2    10-Q, the 2009 second quarter Earnings Release, the 2009 third quarter

3    10-Q, the 2009 third quarter Earnings Release, the 2009 Form 10-K

4    Annual Report, the 2009 fourth quarter Earnings Release and STEC's

5    September 10, 2009, letter to the SEC.

6    (d) Defendants Rajat Bahri, Robert M. Saman, Christopher Colpitts, F.

7    Michael Ball, Dan Moses and Matthew Witte were, during the Relevant

8    Period, members of the Company's Board and purported to be

9    independent when, in fact they were not. Although each of them owed a

10   duty of loyalty to STEC and all its shareholders, each was beholden to

11   the Moshayedis and acted as their *de facto* agents on the Board, in

12   connection with the Offering, their handling of Plaintiff's pre-suit

13   demands and otherwise.  Defendants Colpitts, Ball, Moses, Witte and

14   Saman are named as Defendants solely with respect to the claims

15   asserted derivatively on behalf of STEC.

16   (e) Defendant Mike, although not an officer or director of STEC

17   during the Relevant Period, is alleged to be the recipient of material

18   inside information to unjustly enrich himself and his Trust, one of the

19   Trust Defendants. Defendant Mike is named as a Defendant solely with

20   respect to the claims asserted derivatively on behalf of STEC.

21   32.    Because of their positions with the Company and/or the size of their

22   direct and indirect STEC stockholdings, Defendants Manouchehr, Mark, and Cook,

23   together with the other Individual Defendants, possessed the power and authority

24   to control the contents of STEC's filings with the SEC, documents provided to

25   STEC shareholders and to the investing public, press releases, and presentations to

26   securities analysts, portfolio managers and institutional investors.  They either

27   participated in the preparation and/or were provided with copies of the Company's

28   reports and press releases alleged to be deceptive prior to or shortly after their

1    issuance and had the ability and opportunity to prevent their issuance or cause

2    them to be corrected.  Moreover, Defendants Manouchehr, Mark, Cook and Bahri

3    personally signed and vouched for STEC's Registration Statements on Form S-3

4    filed with the SEC in connection with the Offering and STEC's 2009 Form 10-K

5    Annual Report. Because of their positions with the Company and their access to

6    material non-public information, these Securities Fraud Defendants knew that

7    material adverse facts specified herein were being concealed from and/or

8    misrepresented to the investing public, and that the positive representations being

9    made in the foregoing documents and otherwise were then materially false and

10   misleading.

11        33.    As officers, directors and controlling persons of a publicly-held

12   company whose common stock was, and is, registered with the SEC pursuant to

13   the Exchange Act, traded on NASDAQ, and governed by the provisions of the

14   federal securities laws, the Securities Fraud Defendants each had a duty promptly

15   to disseminate accurate and truthful information with respect to the Company's

16   financial condition and performance, growth, operations, financial statements,

17   business, products, markets, management, earnings, and present and future

18   business prospects, and to correct any previously-issued statements that had

19   become materially misleading or untrue, so that the market price of the Company's

20   publicly traded common stock would be based on truthful and accurate

21   information.  The Securities Fraud Defendants' misrepresentations and omissions

22   of material facts before and during the Relevant Period violated these specific

23   requirements and obligations.  The Securities Fraud Defendants are, therefore,

24   liable for the false and misleading statements identified herein including, *inter alia*,

25   those contained in the Company's S-3 Registration Statements filed with the SEC

26   in connection with the Offering.

27        **D.    The Trust Defendants**

28        34.    Each of Defendants Manouchehr, Mark and Mike formed trusts for

16

1    the benefit of themselves and their respective families for tax, estate planning and

2    other reasons. Defendants Mehrdad Moshayedi Trust, Manouch Moshayedi Trust

3    and Masoud Moshayedi Trust (collectively, the "Trust Defendants") were the

4    vehicles through which each of the Moshayedi brothers typically owned their

5    STEC stockholdings and controlled the Company.

6          35.    The respective Trust Defendants are *alter egos* of the three Moshayedi

7    brothers and their personal knowledge is thereby imputed to such Trusts and *vice

8    versa*. The Trust Defendants are named as Defendants solely with respect to the

9    claims asserted derivatively on behalf of STEC.

10         **E.    Non-Party PWC**

11         36.    PWC , a Delaware limited liability partnership, is registered with the

12   Public Company Accounting Oversight Board ("PCAOB"), pursuant to Section

13   102 of the Sarbanes-Oxley Act of 2002, to prepare and issue audit reports on U.S.

14   public companies.  As one of the world's largest professional services/auditing

15   companies, PWC provides, *inter alia*, auditing, management consulting, tax and

16   other related services, typically on a fee basis. At all material times, PWC acted as

17   the purportedly Independent Registered Public Accounting Firm (or, as commonly

18   known, "auditor") of STEC's financial statements and formally reported upon its

19   year-end statements. PWC, with annual revenues in the billions of dollars, has

20   developed an expertise in the auditing of "high tech" companies such as STEC

21   over many years.  PWC has developed proprietary means of carrying out audits of

22   companies such as STEC including addressing certain manipulative practices

23   which manipulate a company's revenue recognition, reporting on financial

24   statements, and dealing with audit committees of boards of directors.  In the case

25   of STEC, PWC knew or should have known from its vast experience auditing

26   "high tech" companies' financial statements, that the Securities Fraud Defendants

27   had caused STEC to artificially inflate its revenues and earnings at various times

28   during the years 2008 and 2009 by using various illicit techniques including, *inter*

17

*alia*, "channel stuffing," improperly making returns of raw materials and otherwise. In this connection, pursuant to the responsibilities PWC had undertaken contractually and otherwise, its partners responsible for the STEC audits knew that its year-end and other financial statements were not prepared in conformity with GAAP and, indeed, concealed STEC's true financial condition from the investing public. If PWC had "blown the whistle" once it first came to realize that STEC's financial statements were not being prepared in conformity with GAAP (as it had, in fact, learned) and had refused to prepare and allow the public dissemination of its "clean opinions" (i.e. PWC's reports upon the annual financial statements of STEC that were made without qualification), the Securities Fraud Defendants would not have been able to perpetrate the fraud that they did or the Moshayedis and Trust Defendants be able to sell the massive quantities of their STEC stockholdings that they did at the prices they obtained.

## IV.   FACTUAL BACKGROUND AND SUBSTATIVE ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS

37.   Starting prior to the Relevant Period, when STEC's reported revenues and earnings were materially overstated by, *inter alia*, "channel stuffing" and other manipulative devices, and continuing through the time of the Securities Fraud Defendants' misstatements and omissions during the Relevant Period, they or STEC through such officers and/or directors, consistently informed the investing public that because, among other reasons, sales of ZeusIOPS were customized by STEC for each particular OEM customer, purchasing of ZeusIOPS by any given OEM could be expected to pass through a series of phases, with the volume of the OEM's purchases increasing by quantum leaps as the OEM passed from one phase to the next.

A. **Defendants' Misrepresentations and Omissions Concerning ZeusIOPS and the EMC Agreement**

1. **The Securities Fraud Defendants had Consistently Described Their ZeusIOPS Business as One that Eventually Would Produce, *in the Ordinary Course,* Surging Sales to Each ZeusIOPS OEM Customer**

38.     STEC's Form 10-K for the year 2008, filed on March 12, 2009, states "[p]roducts sold to our customers are typically customized by our design and engineering teams to meet our customers' specific design requirements," and "[w]e offer our [OEM] customers a comprehensive technology solution from concept to design to the creation of prototypes through volume production and testing."

39.     According to STEC, the first stage for any ZeusIOPS customer involved STEC selling the customer samples for the purpose of testing and evaluation.  If the first phase was successful, it resulted in the OEM "qualifying" ZeusIOPS for use in one or more "system platforms," and increasing its purchases of ZeusIOPS.[8]

40.     In the second phase – referred to by Defendant Manouchehr during STEC's 2009 second quarter earnings conference call as a "pre-production" – the OEM marketed a system of its own that incorporated ZeusIOPS, by sending its own samples to multiple end-users, while purchasing an increased volume of ZeusIOPS from STEC in order to create these samples.

41.     In the third and final phase, the OEM would receive a stream of orders for its system large and steady enough to justify what STEC's 2008 Form 10-K Annual Report referred to as "volume production" of the OEM's system – also referred to by Defendant Manouchehr during the Company's 2009 second quarter conference call as "production," "full production," and "full ramping production" of the OEM's system.  In this third and final phase, the OEM would purchase a

---

[8] According to STEC, an OEM made at least some purchases of ZeusIOPS even prior to ZeusIOPS having been qualified for the OEM's systems.  Thus, during STEC's 2008 second quarter earnings conference call, Manouchehr stated that STEC has sold a total of $12.2 million of ZeusIOPS "mostly for qualifications."

1  substantially increased volume of ZeusIOPS to support the OEM's substantially
2  increased production of its system that incorporated ZeusIOPS.

3      42.   In 2007, ZeusIOPS had not yet been qualified by any enterprise
4  storage OEM. During STEC's earnings conference call on May 14, 2007,
5  Defendant Manouchehr stated that "we are still in the qualification stages [with
6  ZeusIOPS]," and "once this thing is qualified with customers, the volumes will be
7  significant."

8      43.   On January 14, 2008, STEC announced that, after a year of
9  "collaborative effort" between STEC and EMC Corporation (described by *The*
10  *Wall Street Journal* as "the market-share leader in big computer storage systems")
11  EMC had "selected Zeus-IOPS" for "deployment" in certain "high-end networked
12  storage systems." STEC stated "[t]his union signifies the first adoption of our
13  Zeus-IOPS SSDs in the enterprise storage and enterprise computing markets."

14      44.   Two months later, on March 5, 2008, during the Company's year-end
15  earnings conference call for 2007, a STEC spokesperson, at the direction of
16  Defendant Manouchehr, stated that "[w]e expect production levels to ramp for
17  [EMC] in future quarters."

18      45.   Two quarters later, in its 2008 third quarter 10-Q, STEC reported that
19  ZeusIOPS had been "qualified" for use on the platforms of "one of the largest
20  Enterprise Storage and Server OEMs." During STEC's 2008 third quarter earnings
21  conference call, Defendant Manouchehr stated that sales of ZeusIOPS during the
22  first three quarters of 2008 had already grown substantially compared to sales
23  during 2007, "and this 2008 was just a sampling of what we can do in that type of
24  product [because] we haven't yet gone into *major production*[9]of this product line.
25  Once we do, I think the numbers will be significantly higher than what we are
26
27  _____

28  [9] Unless otherwise noted, the emphasis in this and other parts of this Complaint is added.

1    going today based on just eval[uations] and samples."

2        46.    Another two quarters later, during STEC's 2009 first quarter

3    conference call, Defendant Manouchehr stated that ZeusIOPS was not qualified at

4    all five of the largest enterprise storage OEMs, and indicated that EMC was not in

5    "full production" of systems incorporating ZeusIOPS.[10]

6        47.    One quarter after that, during STEC's 2009 second quarter earnings

7    conference call, Defendant Manouchehr described EMC as being in "full ramping

8    production," and added that once the other four OEMs – described by him as being

9    in "pre-production" – "start kicking in we will see *huge ramps* in sales of

10   ZeusIOPS going forward."

11       48.    According to STEC, although the volume of a given OEM's

12   purchases of ZeusIOPS would increase by quantum leaps as the customer passed

13   from pre-qualification, to pre-production, to volume production, an OEM's

14   purchases could increase – although more gradually – at other times as well,

15   because, as stated in STEC's 2008 10-K Annual Report, "the SSD market will

16   continue to expand over the next few years, aided by the continuation of the

17   decline in Flash components pricing," and because the continuous development of

18   new applications for SSDs would increase the variety of possible OEM systems

19   and interested end users.[11]

20

21

[10] The statements of Defendant Manouchehr during 2008 and 2009 quoted in this
22   Complaint are, *de facto*, attributable as well to the other Securities Fraud
     Defendants, Defendant Mike and the Trust Defendants, all of whom were aware or
23   should have been aware of Defendant Manouchehr's deception and the true state of
     STEC's true revenues, earnings and business condition.
24   [11] During the Company's May 14, 2007, earnings conference call, Defendant
     Manouchehr noted that "everybody in every industry that we are seeing, small or
25   large products that they build they are not trying to integrate Flash into it." As
     explained by *The Wall Street Journal* on January 14, 2008, EMC originally
26   expected that its systems incorporating ZeusIOPS would only be purchased by
     financial institutions needing to "handle hundreds of transaction a second," and,
27   during STEC's 2008 first quarter conference call, Defendant Manouchehr stated
     that systems incorporating ZeusIOPS had not yet been sent by the OEMs "to
28   anybody else besides the financial institutions." However, Defendant Manouchehr

49. Thus, as early as during the Company's May 14, 2007, earnings conference call, Defendant Manouchehr noted that one ZeusIOPS customer that was still in the qualification stage "wants a much larger volume for qualification across their platforms," and that "customers like that will pick up significantly."

50. According to STEC, the achievement of volume production by a specific OEM did not mean the end of the growth in the volume of its purchases from STEC, because the volume of its requirements was likely to *continue* growing as ZeusIOPS was integrated into more and more of the OEM's systems for sale to an increasing variety of end users – which is why, on August 3, 2009, during the second quarter earnings conference call, with knowledge that what he was saying would be deceptive, Defendant Manouchehr interchangeably used the terms "full production" and "full *ramping* production."

51. In sum, it was made clear to the investing public, principally by the Moshayedis, that in the ordinary course of STEC's ZeusIOPS business, total sales of ZeusIOPS were likely to grow over time and, not only were sales of ZeusIOPS to any given customer likely to grow over time, but also, they were likely to exhibit great spurts of growth as the customer transitioned from one phase of purchasing to the next.

52. As reported by STEC and Defendant Manouchehr during quarterly earnings conference calls, from the time of STEC's first collaborative efforts with EMC during 2007 to create EMC systems incorporating ZeusIOPS, through the second quarter of 2009 when EMC achieved "full ramping production" of such systems, STEC's revenues from ZeusIOPS sales increased from quarter to quarter, and year to year by dramatic amounts. These reported results appeared to confirm the scenario depicted principally by the Moshayedis of steadily increasing total

---

immediately added, "I think as we go forward during the year[,] in the second half of the year, we will see more and more applications coming up."

ZeusIOPS sales, driven by the transition of purchasers – up to this point, especially EMC – from pre-qualification, to pre-production, to volume production of systems incorporating ZeusIOPS.

53.    For the year 2007 – the year when STEC reportedly began its collaboration with EMC – STEC reported ZeusIOPS revenues of $11 million, with just the last quarter of 2007 accounting for $7 million of that total.

54.    For the next year – 2008 -- STEC reported ZeusIOPS revenues of $52.7 million – making for a year-over-year increase of almost 400%.  During the Company's year 2008 earnings conference call, Defendant Manouchehr stated that "[o]ur ZeusIOPS business is growing through the roof."

55.    During the Company's year 2008 earnings conference call, Defendant Manouchehr predicted that STEC's ZeusIOPS revenues for just the first half of 2009 would match STEC's ZeusIOPS revenues for the entire year 2008.  An analyst for Capstone Investments commented that "STEC's guidance [for the first half of 2009] should be viewed as nothing short of spectacular."

56.    Halfway through 2009, STEC reported ZeusIOPS revenues of $57.7 million for just the second quarter alone – exceeding in that one quarter the total ZeusIOPS revenues reported for the entire previous year – and reported even larger ZeusIOPS revenues -- $83.4 million – for the first *half* of 2009.

57.    These spectacular reported increases in ZeusIOPS revenues were driven by spectacular reported increases in ZeusIOPS sales to EMC.  Thus, during the first quarter of 2009 – the last quarter prior to the Relevant Period – reported ZeusIOPS sales to EMC totaled $7.55 million; while during the second quarter of 2009, reported ZeusIOPS sales to EMC totaled $33.6 million – an increase of more than 300%.[12]

---

[12] The amounts of EMC's ZeusIOPS purchases here alleged are derived from the following facts:  During the 2009 third quarter earnings conference call, Defendant Manouchehr confirmed an analyst's suggestion that EMC had purchased "$25

1

2. **During the 2009 Third Quarter, the Securities Fraud Defendants Misrepresented the Nature of a New Agreement with EMC, STEC's Largest Customer.**

2

3

58.     On July 16, 2009, early in the third quarter and shortly before the

4

Offering, STEC was caused by the Securities Fraud Defendants to issue a press

5

release announcing an agreement with "one of its largest enterprise storage

6

customers" – later revealed to be EMC – to purchase $120 million worth of

7

ZeusIOPS SSDs *"in the second half of 2009."*

8

59.     The EMC Agreement provided for average quarterly purchases of $60

9

million of ZeusIOPS by EMC during each of the quarters in the second half of

10

2009.  Compared to EMC's ZeusIOPS purchases during the 2009 second quarter –

11

approximately $33.7 million – the EMC Agreement provided for an increase in

12

average quarterly increase over the already high level of EMC's purchases during

13

the 2009 second quarter, it was consistent with the scenario of increasing

14

ZeusIOPS sales to a customer in full production as consistently communicated by

15

the Individual Defendants, and was actually a much smaller percentage increase

16

than already had happened in the 2009 second quarter, when EMC's ZeusIOPS

17

purchases had increased by 300%.

18

60.     Integral to the Securities Fraud Defendants' (principally by

19

20

21

million" of ZeusIOPS during the 2009 *second* quarter.  However, that number can be made more precise:  According to STEC's Form 424B3 filed on August 3, 2009, EMC's *total* purchases from STEC during the 2009 second quarter accounted for 38.9% of STEC's *total* revenues for that quarter.  Because STEC's 2009 second quarter reported revenue was $86.4 million, the precise amount of EMC's 2009 second quarter purchases of ZeusIOPS cannot have been more than $33.7 million.  Defendant Manouchehr's statement demonstrates that, during this period, essentially *all* of EMC's purchases from STEC were for ZeusIOPS.  The amount of EMC's purchases of ZeusIOPS during the 2009 *first* quarter can be derived by subtracting the amount of EMC's purchases from STEC during the 2009 second quarter from the amount of EMC's purchases from STEC during the entire first half of 2009.  EMC's purchases from STEC during the entire first half of 2009, can in turn, be derived from the fact that, according to STEC's second quarter 10-Q, EMC accounted for 27.5% of STEC's total revenues during the first half of 2009.  STEC's reported revenues during the first half of 2009 totaled $149.9 million.

22

23

24

25

26

27

28

1   Defendants Manoucherh and Mark) conditioning the market in anticipation of the

2   Offering, they caused to be issued false and misleading information that would

3   inflate public perceptions of STEC's business prospects. Significantly, STEC's

4   July 16, 2009 press release communicated that the increased size of the average

5   quarterly purchases promised by EMC under the EMC Agreement resulted not

6   from any extraordinary circumstances or terms of the contract, but rather, from the

7   asserted fact that "sales of [EMC's] enterprise storage systems utilizing our

8   ZeusIOPS drives *have grown significantly*."

9       61.   STEC's announcement was intended by the Securities Fraud

10  Defendants, Defendant Mike and the Trust Defendants to be interpreted by the

11  investing public as meaning that the EMC Agreement was a contract signed in the

12  ordinary course of STEC's business (when each of them knew it was

13  extraordinary), that the size of the contract had been determined solely by a rise in

14  the volume of EMC's recurring demand for ZeusIOPS, and that, going forward,

15  EMC would be purchasing roughly $60 million of ZeusIOPS every quarter.  Thus,

16  on the day of STEC's press release, an Oppenheimer analyst reported stated his

17  opinion based on such deception:

18

19          STEC brought out the big gun today (checks suggest
            EMC), and announced a $120 M ZeusIOPS contract for
20          2H.  Relative to our prior model [for 2H] that included
            [a] $60-$70M contribution from EMC, this news raises
21          our model by $50M.  *Looking ahead to '10, we now
            expect rev from EMC alone of > $250M.*

22

23      62.   In other words, based on STEC's press release, Oppenheimer was

24  induced to believe that EMC would purchase a bit more than $60 million of

25  ZeusIOPS *in each of the four quarters.*

26      63.   Not only did Oppenheimer understand STEC to be saying that the

27  level of EMC's purchases would continue at $60 million per quarter, but also,

28  Oppenheimer believed based upon STEC's statements that such purchases would

1    be made under subsequent contracts similar to the EMC Agreement.  Thus, the

2    Oppenheimer report stated that "[we] believe/suspect that a similar supply contract

3    with EMC for all of '10 must be in the works."

4         64.    Following STEC's July 16, 2009 assertions regarding the EMC

5    Agreement, the price of STEC stock rose another 15.2% or $4.20 per share in a

6    single day, over the previous day's closing price, to close at $31.790 per share on

7    July 16, 2009, on extraordinary high trading volume.  STEC's stock price thus

8    reached another all-time high.

9                    **3.    Defendants Continued to Make Misrepresentations**
                             **Concerning the EMC Agreement Following the Initial**
10                           **Announcement**

11        65.    On August 3, 2009, in STEC's second quarter earnings release, the

12   Securities Fraud Defendants repeated their July 16, 2009 announcement, stating

13   essentially, that the EMC Agreement covered EMC's requirements for just the

14   second half of 2009.  Thus, the earnings release stated that, during the Second

15   Quarter, STEC had signed a "$120 million contract to supply ZeusIOPS SSDs to a

16   major Enterprise-Storage customer *for the second half of 2009*."

17        66.    On August 3, 2009, in the Offering Prospectus, included as part of the

18   Form S-3 Registration Statement for the Offering, the Securities Fraud Defendants

19   stated falsely:

20                "We expect continued *growth* in the sales of our
                  Flash-based SSD ZeusIOPS products through 2009
21                based on the *accelerated adoption* of our
                  ZeusIOPS SSDs by most of our major enterprise-
22                storage and enterprise-server OEM customers into
                  their systems.  As part of this expected growth, on
23                July 16, 2009 we announced *an agreement with*
                  *one of our largest enterprise-storage customers for*
24                *sales of $120 million of ZeusIOPS SSDs to* be
                  delivered in the second half of 2009."  [emphasis
25                added]

26   Like the Securities Fraud Defendants' other statements about the Agreement, on

27   July 16, 2009, and August 3, 2009, not only did this statement omit the key fact

     that the Agreement was *not* made in the ordinary course of the STEC's business,
28

                                          26

but also, this statement communicated a contrary impression by describing the EMC Agreement solely as the result of EMC's "adoption" of ZeusIOPS into its systems and a resulting "growth" in EMC's purchases. Following consultation among the Moshayedis and the lawyers (who undoubtedly knew of the materiality of the Agreement and its terms) who were drafting the Registration Statements for the Offering, it was decided by them that the EMC contract required to be included as an exhibit to it was intentionally not to be filed, all of which exacerbated the deception of the investing public.

67.    On August 28, 2009, again reflecting investors' intentionally induced understanding that the $120 million EMC contract was made in the ordinary course of STEC's ZeusIOPS business, and that going forward such contracts with EMC would be repeated every six months, an analyst report published by Needham stated that "[l]ooking forward, we see a high likelihood of a *follow-on contract order* with at least STEC's top OEM customer in 1H10 getting signed within the next 3 months."

68.    Eight days after the August 3, 2009, statements about the Agreement, Defendants Manouchehr and Mark sold their stock in the Offering for $267.8 million.

69.    Three months after the Offering, on November 3, 2009, during STEC's 2009 third quarter earnings conference call, Defendant Manouchehr admitted that, contrary to the impression created by STEC's statements on July 16 2009, and August 3, 2009, "when we did sign the [EMC Agreement], we did – *this was a one-off type of a deal*," and added that "I don't think we are going to be asking our customer for another commitment."

70.    During the Company's 2009 third quarter earnings conference call, contrary to the impression created by STEC's statements on July 16, 2009 and August 3, 2009 that the volume of purchasing under the EMC Agreement would be repeated by EMC going forward, Defendant Manouchehr admitted that "[EMC]

1   might carry inventory of our ZeusIOPS at the end of 2009 which they will use in

2   2010."

3       71.    STEC made the same disclosure in its 2009 third quarter earnings

4   release, also filed on November 3, 2009, which stated that "[w]e recently received

5   preliminary indications that our customer [who placed a $120 million supply

6   agreement with us for shipments covering the second half of 2009] might carry

7   inventory for our ZeusIOPS at the end of 2009 which they will use in 2010."

8       72.    As shown by the following exchange between Defendant Manouchehr

9   and a securities analyst during the Company's November 3, 2009, earnings

10   conference call, the November 3, 2009 disclosure contradicted investors' prior

11   understanding that the EMC Agreement represented a new level of purchasing by

12   EMC, expected by STEC to recur every six months.  Moreover, the exchange also

13   shows that Manouchehr *knew* that investors had been led to believe that the EMC

14   Agreement covered only six months worth of EMC's requirements.  Thus, the

15   analyst asked:

16           "If indeed EMC does carry some inventory . . . if the sell
        through *isn't as great as $120 million, that would imply*

17           *the first quarter would most likely be smaller than what*
        *analysts are modeling* at right now, is that correct?"

18           [Emphasis added]

19   Defendant Manouchehr then responded: "That is true and ***that is why***

20   ***we have put that in our release.***"

21       73.    Subsequently, on February 23, 2010, in STEC's earnings release for

22   the 2009 fourth quarter and full year, the Company made another disclosure that

23   lent further clarity to the misleading impression created by the Securities Fraud

24   Defendants' statements on July 16 and August 3, 2009 that the EMC Agreement

25   represented a new increased level of purchasing by EMC that would be repeated

26   going forward.  Thus, the February 23, 2010 earnings release stated, "[W]3 not

27   anticipate this inventory carryover to continue to negatively impact our sales to this

28   customer during the first *half* of 2010, as we do not expect any meaningful

1    production orders from this customer during that time."

2        74.    The fact that the information in the Company's February 23, 2010,

3    earnings release contradicted the impression that had been created by the Securities

4    Fraud Defendants' statements on July 16, 2009 and August 3, 2009 is shown by a

5    securities analyst's report published by B. Riley on February 24, 2010, which

6    stated "STEC's new guidance indicates that it expects EMC to take at least a whole

7    year to work through its $120MM July 2009 order for ZeusIOPS SSDs; *this order*

8    *was envisioned as meeting six months of demand.*"

9        75.    Similarly, a securities analyst's report published by Oppenheimer on

10    February 24, 2010, stated, "Now that *EMC's supply contract with STEC for*

11    *$120M is indicative of a full-year run rate v. half year*, we are resetting out '10E

12    EPS . . . and dropping our PT . . . "

13        76.    Still another securities analyst's report – this one published by

14    Deutsche Bank on February 23, 2010 – suggested that the analyst had been misled

15    regarding the ongoing level of EMC's requirements, stating "we had assumed

16    EMC's demand for SSDs was higher than it now appears . . . We now see EMC

17    revenue of roughly *$25M/Q* in F2H-10, which *we believe has been EMC's true*

18    *demand over the past few Qs*." Significantly, a purchase volume of $35 million

19    per quarter – the volume proposed by the Deutsche Bank analyst as EMC's "true

20    demand" – is only about *half* of the quarterly volume of purchases under the EMC

21    Agreement, which is just another way of saying that the true period covered by the

22    EMC Agreement was twice as long as investors had been led to believe. Also

23    significantly, an EMC purchase volume of $35 million per quarter is only about the

24    same as the volume that EMC had reportedly purchased during the 2009 *second*

25    *quarter* ($33.6 million), the quarter that ended *just prior* to the announcement of

26    the EMC Agreement – which, in turn, was quickly followed by the Moshayedis'

27    and Trust Defendants' sale of their stock.

28        77.    Like the Deutsche Bank report, a Thomas Weisel Partners report

1    published on February 24, 2010, expressed a belief that investors had been misled.

2    The report lowered the analyst's price target for STEC stock based on "our loss of

3    confidence in STEC management."

4         78.    Ultimately, Defendant Manouchehr himself admitted that, although

5    EMC had a certain recurring volume of demand for ZeusIOPS, in the words of the

6    Deutsche Bank analyst, EMC's "***true*** [quarterly] demand" was only about ***half*** of

7    the quarterly volume of EMC's purchases under the EMC agreement.  Thus,

8    during the 2010 first quarter earnings conference call, an analyst asked Defendant

9    Manouchehr "So maybe your normalized quarterly revenue run rate for ZeusIOPS

10   is somewhere between $30 million and $40 million.  Is that a fair statement?

11   Defendant Manouchehr answered: "I can speculate, but *those numbers seem to be*

12   *logical.*"  Since quarterly purchases by the other OEM's during each of the three

13   quarters from the 2009 third quarter through the 2010 first quarter ranged from

14   $6.7 million to $10.4 million,[13] that means the "normalized quarterly"

15   requirements of EMC were [$30 million - $40 million] minus [$6.7 – 10.4

16   million], or, *at most*, about $33.3 million.

**B.    The Securities Fraud Defendants Knew that Their Representations Regarding the EMC Agreement Were False.**

**1.    Defendant Manouchehr Subsequently Admitted That the Securities Fraud Defendants Always had Known that the EMC Agreement was a One-Off Contract.**

79.   On July 16, 2009, when STEC was caused by the Securities Fraud

Defendants to announce the EMC Agreement, and on August 3, 2009, when the

EMC Agreement was again touted, the Securities Fraud Defendants already knew

or should have known that the $120 million contract was an exceptional, one-time

---

[13] The calculation of ZeusIOPS purchases by the other OEMs during each quarter of 2009 is explained below.  The amount of their purchase during the first quarter of 2010 is derived from the fact that ENMC made no ZeusIOPS purchases during that quarter and, according to Defendant Manouchehr's statement during the 2009 first quarter earnings conference call, STEC's ZeusIOPS revenues during that quarter were $10.4 million.

1   purchase agreement, *not* indicative of a new ongoing level of demand for STEC's

2   ZeusIOPS product by EMC, and that, going forward, EMC would *not* be

3   purchasing similar volumes every six months.  Thus, on November 3, 2009, during

4   STEC's third quarter earnings conference call, when Defendant Manouchehr first

5   admitted that the EMC Agreement was "a one-off type of a deal," he did not

6   describe this fact as a new discovery.  To the contrary, he stated "So *when we did*

7   *sign* the [EMC Agreement], we did – *this was* a one-off type of a deal."

2.   **Defendant Manouchehr's Admission Also Means the**
**Securities Fraud Defendants Knew that EMC Would Not**
**Continue Purchasing at the Same Volume**

10   80.   The Securities Fraud Defendants' knowledge on July 16, 2009 and

11   August 3, 2009, that the EMC Agreement was "a one-off type of a deal," also was

12   knowledge that, after the end of the period covered by the Agreement, EMC would

13   *not* continue buying at the same volume as under the Agreement, because, as

14   Defendant Manouchehr admitted, purchases from STEC at such a volume could

15   not be made by any of STEC's customers unless they entered into an agreement –

16   such as the EMC Agreement – in advance of the purchases.  Thus, during the

17   August 3, 2009, earnings conference call, when asked by a securities analyst

18   whether STEC would sign other agreements similar to the EMC Agreement,

19   Defendant Manouchehr responded, "when you get to a point where the amount of

20   components that you need are extremely large, we can't or we won't, at least, go

21   make those commitments to our suppliers and bring the parts in on a whim.  We

22   need to have [a] very solid forecast and *solid commitments* in order to do that."

23   Because each of the Securities Fraud Defendants always had known that EMC

24   would not be making any more such agreements – because the Agreement was a

25   "one off" contract – they also always had known that EMC would not continue

26   purchasing ZeusIOPS at volumes similar to its purchases under the Agreement.

27

28

### 3.   STEC's Intimate Relationship With its OEM Customers Also Supports the Securities Fraud Defendants' Scienter

81.    The knowledge of the Securities Fraud Defendants on July 16, 2009, and August 3, 2009, that after the term of the Agreement, EMC would *not* be making recurring purchases of a volume similar to its purchases under the Agreement is also supported by EMC's subsequent statement, made during its own January 6, 2010, earnings conference call, that the EMC Agreement was not intended to cover EMC's requirement only for the second half of 2009, but, rather, "was ***designed*** to protect ourselves going into first quarter [2010] against what we knew would be a tight supply environment."

82.    EMC's statement on January 6, 2010, is indicative not only of EMC's knowledge, but also, of the Securities Fraud Defendants' knowledge, but also, of the such Defendants' knowledge, given Defendant Manouchehr's statement about STEC's need for advance warning regarding an OEM's large supply requirements, and given STEC's prior statements, described below, that STEC and EMC had a long-running, still ongoing, ***intensely intimate*** working relationship.

83.    Thus, on November 10, 2008, during STEC's 2008 third quarter earnings conference call, a STEC spokesperson stated, "the largest Enterprise Storage customer we are in production with, it took us ***over a year of daily and weekly meetings*** with our engineering teams, and we went through more than 30 firmware revisions to optimize the performance of our products with their system."

84.    Indeed, as far back as January 14, 2008, STEC announced that "EMC and STEC [had] collaborated . . . [o]ver the past year" – *i.e.,* starting a full two and a half years before the EMC Agreement was signed, -- declared that STEC was "delighted to ***partner*** with EMC," and described EMC's selection of ZeusIOPS as a "***union***" of STEC and EMC.

85.    Moreover, STEC's own statements show that its intimate relationship with its OEM customers constitutes straight through such customers' production phase. STEC's 2008 10-K, filed on March 12, 2009, states that "[d]uring our

32

1    customers' production phase, we provide extensive support which includes

2    training, system-level design, implementation and integration support." Indeed, as

3    an analyst observed during STEC's 2009 third quarter earnings conference call

4    without being contradicted by any Defendant, at that late date, a full quarter *after*

5    the EMC Agreement had been signed, STEC *still* had its own engineers "co-

6    located with EMC."

7        86.    Still further support for the scienter of Defendant Manouchehr and the

8    other Securities Fraud Defendants is provided by the timing of his admission that

9    "***when we did sign*** the [EMC Agreement], we did – ***this was*** a one-off type of a

10   deal." This admission followed rather than preceded not only the initial,

11   misleading explanation of the EMC Agreement, but also, the sale of nine million of

12   their own personal shares of STEC by Defendants Mark and Manouchehr for

13   $267.8 million as well as the shares sold by Defendant Mike and the Trust

14   Defendants. Moreover, the admission followed the misstatements about the

15   Agreement and the sale of the Moshayedis' stock so quickly that it came at the end

16   of the same quarter in which the misstatements were made and the stock was sold,

17   and did so despite the fact that, at the time of the admission, the EMC Agreement

18   still had another full quarter to run.

19       87.    Indeed, after Defendant Manouchehr's admissions during the

20   November 3, 2009, conference call, a securities analyst from Thrivent Asset

21   Management indignantly pointed out to Defendant Manouchehr that "in August,

22   you guys are [sic] sold a majority position of your stock," and then asked "are you

23   considering buying any back?"

24       88.    Also significant is the fact that Defendant Manouchehr uses the term

25   "we" in his admission. From the beginning, Defendant Mark knew as much about

26   the Agreement as Defendant Manouchehr did, because, as stated by a confidential

27   witness who was one of STEC's regional sales managers at the time when the

28   Agreement was executed and announced, both Defendants Manouchehr and Mark

were heavily involved in the Company's large deals as indicated by a confidential witness in the Securities Litigation: "nothing happened at that place without those two."[14]

    **4.    The Securities Fraud Defendants' Failure To File The EMC Agreement With Form S-3 Registration Statements, After Promising The SEC That Any Material One-Off Contracts With EMC Would Be Filed, Is Additional Evidence Of Their Scienter With Respect To Their Misleading Statements About The EMC Agreement**

89.    Pursuant to Item 601(b)(10) of Reg. S-K and its instructions, "[e]very contract not made in the ordinary course of business [such as the EMC Agreement] which is material to the registrant," and, even if made in the ordinary course of business, "[a]ny contract upon which the registrant's business is substantially dependent" must be filed with the Form 10-Q or 10-K for the period during which the contract was executed.  Among other justifications for this requirement, disclosing to investors the terms of the contract protects them from being misled into believing that a significant one-time contract obtained, for example, by the registrant having made extraordinary promise, is indicative of an ongoing trend in the issuer's results of operations.

90.    Upon information and belief, to this day, the Securities Fraud Defendants have not caused STEC to file the $120 million EMC Agreement with the SEC as the Company was and is required to do.

91.    Moreover, no later than the end of August 2009, STEC and the Securities Fraud Defendants were on notice that failure to file a "one-off" contract of such central importance to its business as the EMC Agreement would be viewed as highly questionable by the SEC.  By letter dated August 28, 2009, the SEC

---

[14] This confidential witness apparently worked for STEC from February 2006 through July 2009.  He was the Company's Regional Sales Manager for the San Francisco Bay Areas and Pacific Northwest and reported to Mike Nilsson, STEC's Worldwide Vice President of Sales. Plaintiff alleges that to the extent Defendants Manouchehr and Mark were knowledgeable, Defendant Mike was as well.

1  wrote to STEC questioning, among other things, the Company's failure to file

2  other, much smaller agreements with EMC that had been made during the previous

3  year – when EMC accounted for a much smaller proportion of STEC's business

4  than it accounted for in 2009.

5      92.    Thus, by letter dated August 28, 2009, the SEC asked why no "master

6  agreement" with EMC, such as was referred to in STEC's 2008 10-K Annual

7  Report, had been filed with that Form 10-K, given that, even at that early date,

8  EMC already accounted for 15.2% of STEC's total revenues.

9      93.    STEC's only proffered defense for this earlier failure was an argument

10  that the Company knew could not excuse its failure to file the EMC Agreement,

11  which was of the utmost materiality to the statements made publicly with regard to

12  it, including those made within the Company's S-3 Registration Statements filed

13  with the SEC in connecting with the Offering.  Thus, by publicly filed letter, dated

14  September 10, 2009, signed by Defendant Cook, the Securities Fraud Defendants

15  responded to the SEC that, "STEC's master agreements typically are non-exclusive

16  and *do not contain any binding long-term volume commitments* . . . actual sales

17  of STEC products are made through more specific sales agreements such as

18  individual purchase orders."

19      94.    The SEC was not satisfied with Defendant Cook's response which

20  was, itself, deceptive.  Thus, by letter dated September 30, 2009, the SEC again

21  wrote to STEC, stating

22                                        "*[I]t remains unclear to us how you have concluded that you are not*

23                                        *substantially dependent upon any of your agreements with . . . EMC Corporation*, such that they are not required to be filed pursuant to Item 601(b)(10)(ii)(B) of Regulation S-K.  We note your statements

24    that STEC's master agreements typically are non-exclusive and that they do not contain any binding long-term volume commitments, and

25    that actual sales are made through more specific sales agreements such as purchase order . . . *With respect to any individual purchase*

26    *order that accounted for a significant amount of the company's revenues, please advise how you concluded that any such purchase*

27    *order is not required to be filed as a material contract under Item 601(b)(10).*"  [Emphasis added]

28      95.    By publicly filed letter dated October 13, 2009, and again signed by

1    Defendant Cook, the Company responded that:

2            "STEC received over 100 individual purchase orders from EMC
             related to 2008 deliveries. ***The amounts of these purchase orders***
3            ***ranged from $450 up to approximately $5.2 million for the largest***
             ***individual purchase order*** . . . As a result, STEC believes that none of
4            the individual EMC purchase orders received for 2008 Shipments
             constitutes a material contract under Item 601(b)(10) of Regulation S-
5            K." [Emphasis added]

6        96.    Thus, the only excuse that Defendant Cook even attempted for the

7    Company's failure to file any EMC agreement with the 2008 Form 10-K or the S-3

8    Registration Statements was that the largest actual purchase order by EMC during

9    2008 was for only $5.2 million.  Obviously, such an argument could not possibly

10   excuse STEC's failure to file the EMC agreement, since that agreement was for

11   $120 million – an amount *23 times larger* than STEC's largest previous binding

12   commitment from EMC.

13       97.    Moreover, while the SEC expressed concern about STEC's failure to

14   file any agreement with EMC during a period of 2008 in which EMC accounted

15   for as much as *15.2%* of STEC's revenues, EMC's importance to STEC

16   subsequently increased, until by the second quarter of 2009, EMC accounted for

17   *38.9%* of STEC's revenues, as disclosed in STEC's Form 424B3 filed on August

18   3, 2009.

19       98.    Significantly, STEC's September 10, 2009, letter to the SEC ended

20   with a statement that "[*g]oing forward*, the Company will continue to assess each

21   quarter whether it is depended upon anyone agreement such that an exhibit filing is

22   required under Item 601(b)(10)(ii)(B)." [Emphasis added] Nevertheless, even after

23   making this promise to the SEC, the Individual Defendants, each of whom had

24   signed the Form S-3 Registration Statements, still failed to file the EMC

25   Agreement – as they ***immediately*** should have done, attaching it to a Form 8-I.

26       99.    By failing to file the EMC Agreement with STEC's 2009 second

27   quarter Form 10-Q, or to file the Agreement with a Form 8-K immediately after

28   receiving the SEC's August 28, 2009, letter, the Securities Fraud Defendants sent a

36

1    misleading message to investors that the EMC Agreement did  not need to be filed

2    with the SEC, because it was a contract made in the ordinary course of business.

3        100.   By failing to file the EMC Agreement, the Securities Fraud

4    Defendants also sent a misleading message that STEC's business was not

5    "substantially dependent on" the EMC Agreement.  This second misleading

6    message was reinforced by an explicit false statement made in Defendant Cook's

7    September 10, 2009 letter to the SEC, that "in the unlikely event a customer should

8    default under a purchase order or other sales agreement, including the EMC

9    Agreement.

10       101.   The Securities Fraud Defendants' failure to file the EMC Agreement

11   with the SEC was a material violation of Regulation S-K.  Moreover, their failure

12   to so file it even after the Securities Fraud Defendants' failure to file the EMC

13   Agreement with the SEC subsequent to the Commission's specific requests raises a

14   strong inference that all of the Securities Fraud Defendants' false

15   statements/omissions regarding EMC in the Offering Prospectus, in the S-3

16   Registration Statements and otherwise were made with an intention to conceal the

17   full truth about the Agreement from investors.

18   **C.    During The 2009 Third Quarter, The Securities Fraud Defendants
         Made Multiple Misleading Statements And Material Omissions**
19   **Regarding Sales Of ZeusIOPS To STEC's Other OEM Customers.**

20       **1.    The Securities Fraud Defendants Falsely Represented That
               They Expected The Other OEMS To Increase Their**
21   **ZeusIOPS Purchases During The Second Half Of 2009.**

22       102.   At the same time that the Securities Fraud Defendants made or caused

23   to be made misstatements regarding the EMC Agreement, they also stated falsely

24   that they expected ZeusIOPS sales to increase to most o their order OEM

25   customers during the second half of 2009 – which, at that time, had five months

26   left to run.  Thus, in the Offering Prospectus, filed on August 3, 2009, they caused

27   STEC to state:

28       "We expect *continued growth* in the sales of our

Flash-based SSD ZeusIOPS products *through 2009* based on the accelerated adoption of our ZeusIOPS SSDs *by most of our major enterprise-storage and enterpriser-server OEM customers* into their systems." [Emphasis added]

103.   Based on STEC's 2009 second quarter earnings release, also disseminated on August 3, 2009, investors were informed that the reference in the Offering Prospectus to STEC's "major enterprise-storage and enterprise-server OEM customers" included Fujitsu and Compellent, as well as the five OEM customers previously referenced during the 2009 first quarter conference call – EMC, IBM, HP, Hitachi and Sun.  The Company's second quarter earnings release stated that one of the "highlights" of STEC's 2009 second quarter had been "accelerated adoption of the ZeusIOPS SSDs into major Enterprise-Storage Enterprise-Server OEM customers including IBM, Fujitsu, Compellent and HP."

**a.      Subsequent Analyst Reports Reflected This Statement**

104.   Securities analysts' responses to STEC's assertion demonstrated their understanding that STEC's management was predicting continued revenue growth based on the Other OEMs increasing their ZeusIOPS purchases during the second half of 2009.

105.   On August 3, 2009, a securities analyst's report by Thomas Weisel Partners noted that STEC had given an "upbeat outlook as the growth acceleration driven by the enterprise-SSD ZeusIOPS segment continues to ramp," and that "[t]he company expects . . . enterprise storage OEMs [to] continue ramping."

106.   On August 4, 2009, a securities analyst's report issued by ThinkEquity, LLC noted that STEC's product mix had shifted toward ZeusIOPS and that "[w]e believe *2H09 should see* continuing upside to the consensus, with *ramps outside EMC*."

107.   On August 4, 2009, a securities analyst's report issued by Capstone Investments stated that "STEC's SSD revenue acceleration over the last 12-months has been nothing short of phenomenal," ZeusIOPS revenues grew during the

1  second quarter "as largest customer EMC continues it appetite for adoption during

2  FY09," and "[f]urther customer acceleration is likely **during 2H09** as IBM, HPQ,

3  [Compellent] and Fujitsu all begin to ramp from sampling orders towards full

4  production."

5      108.  On August 4, 2009, a securities analyst's report issued by Needham

6  stated "STEC's string of successes continued in the June quarter, with strong

7  growth in ZeusIOPS and impressive margins.  We expect this trend to repeat as

8  STEC's customers ramp and deploy SSDs into the marketplace."

9      109.  On August 10, 2009, Wedbush Morgan ("Wedbush") initiated

10  research coverage of STEC, with its securities analyst noting that STEC had

11  "captur[ed] design wins at leading OEM's and had "secured at $120MM supply

12  agreement with one of its leading customers who we believe to be EMC."  The

13  analyst then added that:

14      "[w]e expect due to STEC's monopoly of the fibre channel
        SSD market (*i.e.,* with ZeusIOPS] that  it will likely secure
15      similar supply agreements with the company's other Tier 1
        OEMs.  We expect these announcements to be positive analyses
16      *in the near term* driving shares higher."  [Emphasis added]

17  Although ZeusIOPS' monopoly of the fibre channel SSD market was a reason why

18  any customer deciding to purchase a fibre channel SSD would buy it from STEC,

19  the timing of the expected supply agreements reported by this analyst:

20      "in the near term" – clearly reflected STEC's prediction in the
        Prospectus of "continued growth in the sales of our Flash-based
21      SSD ZeusIOPS products *through 2009* based on the
        accelerated adoption of our ZeusIOPS SSD *by most of our*
22      *major enterprise-storage and enterprise-server OEM customers*
        into their systems."  [Emphasis added]

23      110.  On August 16, 2009, a securities analyst's report issued by Deutsche

24  Bank, titled, "In the lead in a rapidly growing market," reported that, in addition to

25  the purchases of ZeusIOPS by EMC, "STEC is also ramping new business with

26  IBM, HP, Hitachi and Sun, and *we expect these customers' volumes to grow over*

27  *the next few quarters."*

28      111.  On September 9, 2009, a securities analyst's report issued by

1    JPMorgan initiated coverage of STEC, describing it as "the high-growth story in
2    our coverage universe and technology in general," and reporting as fact "the
3    pending cascade of revenues as multiple OEM customers [of STEC's SSDs]
4    prepare to ramp."

5         112.   Although, during the Company's August 3, 2009, second quarter
6    earnings conference call, Defendant Manouchehr did say that STEC's customers
7    other than EMC were "maybe a quarter or a two away from full ramping
8    production," this statement did not contradict the statement in STEC's Offering
9    Prospectus that *increased sales were expected* from the OEMs other than EMC
10   *during the second half of 2009*.  For one thing, the Securities Fraud Defendants had
11   never said that ZeusIOPS sales would only increase when customers were in full
12   production.  On the contrary, the Securities Fraud Defendants had consistently
13   represented that increases in sales of ZeusIOPS could be expected quarter after
14   quarter even in the absence of any OEM being in full production.  As early as
15   during the 2008 second quarter earnings conference call, before STEC had
16   announced that any of its five large OEM customers was in full production or that
17   any of the large OEM's had even "qualified" ZeusIOPS for any system, Defendant
18   Manouchehr had asserted that "we have shown *quarter after quarter* that Zeus
19   growth is [an] absolute possibility and it is happening."  For another thing, on
20   August 3, 2009, there were still five months – or almost two full quarters – left in
21   2009.  Therefore, it would be consistent with the other OEMs being "a quarter or
22   two away from full production" if they began transitioning to full production
23   before the end of the year.  This is precisely the message received by the securities
24   analyst at Capstone Investments, who reported on August 4, 2009, that "[f]urther
25   customer acceleration is likely *during 2H09* as IBM, HPQ, CML and Fujitsu all
26   begin to ramp from sampling orders *towards* full production."

### b. The Statement was False

28        113.   Contrary to the statement that the Securities Fraud Defendants' caused

40

1   to be made that the other OEMs would increase their ZeusIOPS purchases during

2   the second half of 2009, ZeusIOPS purchases by the other OEMs during the

3   second half of 2009 *dramatically shrank*, from $42.2 million in the first half of

4   2009, to only $14.7 million in the second half of 2009.[15]

5        114.   The following table (with number representing millions) shows, for

6   each quarter of 2009, (1) total sales of ZeusIOPS, (2) sales of ZeusIOPS to EMC,

7   and (3) sales of ZeusIOPS to the other OEMs:

8

9

|  | Q1 2009 | Q2 2009 | Q3 2009 | Q4 009 |
|---|---|---|---|---|
| Total ZeusIOPS Revenues | $25.7 | $57.7 | $60.7 | $74.0 |
| EMC's ZeusIOPS Purchases | $7.6 | $33.6 | $54.0 | $66. |
| The Other OEM's ZeusIOPS Purchases | $18.1 | $24.1 | $6.7 | $8.0 |

14        115.   Moreover, as further explained, *infra*, at the time when the Securities

15   Fraud Defendants stated that they expected sales of ZeusIOPS to the other OEMs

16   to grow during the second half of 2009, they knew that their statement was false,

17   and knew that, contrary to their statement, such sales would drop – and drop

18   dramatically.

19                    **c.    The Statement was Knowing False When Made**

20        116.   As demonstrated, *infra,* the Securities Fraud Defendants' knowledge,

21   on August 3, 2009, that sales to the other OEMs would drop during the second half

22   of 2009 is shown by the fact that, as of August 3, 2009, these Defendants already

23   had caused the Company to order almost the exact amount of supplies – *i.e.,*

24   *inventory* – that ultimately was needed by STEC in order to sell the amount of

---

[15] The amount of ZeusIOPS purchases by the other OEMs has been calculated by subtracting the amount of ZeusIOPS purchases by EMC from the total amount of STEC's ZeusIOPS revenues.  The total amount of STEC's quarterly ZeusIOPS revenues was disclosed during STEC's quarterly earnings conference calls.

1    ZeusIOPS to both EMC and the other OEMs that actually was sold during the

2    second half of 2009, while leaving STEC, at the end of 2009, with the amount of

3    inventory on hand that, according to the Securities Fraud Defendants themselves,

4    was optimal.

### i.    The Securities Fraud Defendants' Knowledge Of The Amount Of Future Sales Was Greater For ZeusIOPS Than For STEC's Other Products

7    117.    Starting prior to the Relevant Period, the Securities Fraud Defendants

8    made clear to investors that their knowledge of the amount of future sales was

9    greater for ZeusIOPS than for their other products.

10    118.    On March 12, 2009, during the Company's 2008 fourth quarter

11    earnings conference call, an analyst asked Defendant Manouchehr, "[a]s your Zeus

12    product line continues to grow as a piece of your overall mix, is this enabling you

13    with any level of improved visibility positively." As an example of STEC's

14    greater knowledge of future sales when those sales are based on ZeusIOPS,

15    Manouchehr then pointed out that, as of March 12, "[w]e already said that the first

16    half this year, we think that we're going to surpass what we did in last year."

17    119.    As an example of STEC's ability to accurately estimate future sales of

18    ZeusIOPS, during the Company's 2008 third quarter earnings conference call,

19    Defendant Manouchehr pointed out that, as much as "6 quarters ago, " STEC had

20    estimated that sales of ZeusIOPS for the year 2008 would total $50 million.  Six

21    quarters – one and a half years – after making that estimate, during the 2008 fourth

22    quarter earnings conference call, the estimate apparently was verified when STEC

23    announced that its ZeusIOPS sales for 2008 totaled $53 million.

24    120.    The Securities Fraud Defendants' accurate knowledge of future

25    demand for ZeusIOPS results from the close collaboration between STEC and its

26    ZeusIOPS customers, as described by STEC in its January 14, 2008 press release

27

28

1    regarding EMC, and by Defendant Manouchehr during the Company's 2008 third

2    quarter earnings conference call – quoted, *supra,* in paragraphs 51 and 91.[16]

3        121.   Without this close collaboration with its customers and the resulting

4    advance knowledge that STEC had regarding ZeusIOPS demand, the Company

5    would not have been able to implement what its 2008 Form 10-K Annual Report

6    referred to as STEC's "strategy of closely matching inventory levels with product

7    demand."

8                    **ii.    STEC Ordered Inventory In Advance In Order**
                    **To Fill Expected ZeusIOPS Purchases**

9        122.   As disclosed in STEC's quarterly SEC filings, the majority of its

10   inventory is comprised of the raw materials that the Company needs to build it

11   products.  As also disclosed in STEC's quarterly SEC filings, in order to prepare

12   for *expected future sales* of ZeusIOPS, STEC makes "non-cancelable inventory

13   purchase ***commitments***."   [Emphasis added] Thus, as stated in STEC's 2009

14   Form 10-K Annual Report, filed on February 23, 2010, STEC makes such "non-

15   cancellable inventory purchase commitments as a result of the actual and

16   *anticipated growth* in *orders* for our ZeusIOPS products."  [Emphasis added]

17       123.   Thus, during the Company's 2008 second quarter conference call, on

18   August 4, 2008, Defendant Manouchehr stated that, for STEC's SSDs:
             "[w]e will see good *purchase orders* and forecasts from major OEMs

19           that carry on up to first quarter of 2009 [*i.e.,* through two full future
             quarters] and *as a result, we locked in all the material that was needed*

20           *for all of that purchase order*."   [Emphasis added]

21       124.   In short, as soon as the Company knows the amount of its future

22   ZeusIOPS sales, STEC makes non-cancellable inventory purchase commitments

23   sufficient to provide for those sales; and STEC usually knows the amount of its

24   future ZeusIOPS sales at least two quarters in advance of completing the sales.

25

26   [16] As explained by a confidential witness in the Securities Litigation, the former
     Chief Technologist for Storage and Data Management at Sun, when an OEM

27   requires supplies of SSDs, it is to the advantage of the OEM to give its supplier
     advance notice of its requirements, in order to avoid any bottlenecks in the chain of

28   supply.

125. In addition to calibrating its non-cancelable inventory purchase commitments to support its future ZeusIOPS sales, STEC also calibrates its non-cancellable inventory purchase commitment so as to leave STEC with a certain amount of inventory at the end of each quarter. On May 11, 2009, during the Company's 2009 first quarter earnings conference call, Defendant Manouchehr was asked whether STEC was planning on changing its inventory level. He responded "I think our inventory will remain in the $40 million range. I think that is our goal, to keep it in the $40 million range."

  **iii.** **At The Time When The Offering Prospectus Was Issued, STEC Had Ordered The Amount Of Inventory Actually Needed For The Sales Subsequently Made During The Second Half Of 2009**

126. Based on information from STEC quarterly reports for the 2009 second, third and fourth quarters, the following chart shows both the amount of inventory ordered in a given quarter for future use, and the amount of inventory actually used in a given quarter to support the sales made in that quarter. The amount of inventory ordered for future use is the amount of "non-cancellable inventory purchase commitments." The amount of inventory actually used in a given quarter to support the sales made in that quarter is, essentially, the "cost-of-revenues" for that particular quarter. As shown in the preceding chart, the cost of STEC's revenues – *i.e.*, the amount of inventory actually used by the Company in order to make its sales – in the third and fourth quarters of 2009 was, in turn, $49.5 million and $52 million. Therefore, for the entire second half of 2009, STEC's cost of revenues was $101.5 million.

| STEC Revenues and Inventory ($ 000s) | | | |
|---|---|---|---|
| Reporting Period | 2Q 2009 | 3Q 2009 | 4Q 2009 |
| Net revenues | 86,350 | 98,293 | 106,004 |
| Cost of revenues | **43,177** | **49,478** | **52,078** |
| Non-cancelable inventory purchase commitments | **103,222** | 6,859 | 14,177 |
| Inventory | 37,656 | 35,555 | **42,739** |

127.   As also shown in the preceding chart, the non-cancelable inventory purchase commitments made by STEC in *advance* of the second half of 2009, during the second quarter of 2009, was ***$103 million***, almost exactly equal to the cost of the total sales that STEC actually made during the second half of 2009.

128.   Moreover, during the 2009 third quarter when STEC was falsely announcing that it expected ZeusIOPS sales to the other OEMs to increase during the second half of 2009, STEC's non-cancelable inventory purchase commitments were a *de minimis* $6.9 million – which was just enough to bring STEC's total inventory on hand at the end of 2009 to $42.7, almost exactly equal to the $40 million goal announced by Defendant Manouchehr during the Company's 2009 first quarter earnings conference call.

129.   If, in August, when they made their misstatements, the Securities Fraud Defendants had really expected ZeusIOPS sales to the other OEMs to increase during the second half of 2009, they would have ordered inventory sufficient to support such increased sales.  Instead, at the same time when the Securities Fraud Defendants were publicly stating an expectation that sales to the other OEMs would *increase*, they were ordering just enough inventory to provide for sales of ZeusIOPS to the other OEMs that would ***drop by more than $27 million*** during the second half of 2009, as compared to the first half of 2009.

**d. Investors were surprised when the truth was partially disclosed on November 3, 2009.**

**i.     Sales To The Other OEMS Were *Down* And Would Not Recover During 2009**

130.   On November 3, 2009, during STEC's 2009 third quarter earnings conference call, Defendant Manouchehr not only admitted that the EMC Agreement was a "one-off type of a deal," but also, that "the rest of the [ZeusIOPS] account did not come along as fast as we had anticipated.  So, therefore, ***their numbers were down.***"  [Emphasis added]

131.   Defendant Manouchehr added that IBM's purchases of ZeusIOPS "dropped off significantly in the third quarter" and that Sun's purchase of ZeusIOPS were below "normal volumes."

132.   During the Company's November 3, 2009, conference call, and in STEC's 2009 third quarter earnings release – disseminated on the same day – STEC issued its fourth quarter revenue guidance.  The increase in fourth quarter revenues predicted by this guidance – only $2.7 to $4.7 million – was substantially less than the expected increase in fourth quarter sales to EMC under the EMC Agreement -- $12 million.  Because any increased sales of ZeusIOPS during the fourth quarter therefore would be attributable to the EMC Agreement, there would be no fourth quarter recovery of ZeusIOPS sales to the other OEMs during the fourth quarter, ZeusIOPS sales to the other OEMs during the entire second half of 2009 were not even going to *match* the level of such sales during the *first half* of 2009, much less would there be any *increase* in such sales as compared to during the first half of 2009.

**ii.     The Other OEMS Had Not Even Started Building Systems Incorporating ZeusIOPS**

133.   One securities analyst noted that these results were contrary to the Securities Fraud Defendants' prior representations regarding their ability to forecast ZeusIOPS sales.  The analyst stated:
> "***Your visibility seems to have changed.  I don't want to, I guess, use any adjectives.  Let's just say it's changed***, but when do you believe the prior visibility returns.  Is it really going to solely revolve around

46

your largest customer or have there been some other dynamics that have kind of changed your near-term visibility here?"   [Emphasis added]

134.   Responding to this question, Defendant Manouchehr disclosed for the first time that *the other OEMs had not even started "building in SSDs into their systems*," and that, for practical purposes, they could not even be considered customers.  Manouchehr stated, "you really can't have very good visibility with having one single customer . . . we'll get to extremely good visibility once the IBMs, the Suns, the Hitachi Data Systems and the HPs of the world come along and start building in SSDs into their systems as well."

135.   When another securities analyst suggested that most of the other OEMs "aren't selling to any degree yet," Defendant Manouchehr responded, "exactly."  Then he added that "five customers worldwide dominate the whole enterprise storage markets, and that's EMC, IBM, Hitachi Data Systems, HP, and Sun," and that STEC would be "back to the races" when these OEM's "customers start seeing systems with SSDs on board."

136.   Given Defendant Manouchehr's prior statement that STEC and one of its ZeusIOPS customers had needed "over a year of daily and weekly meetings . . . to optimize the performance of our [ZeusIOPS] products with [the customer's] system," the Securities Fraud Defendants already knew at the time of their misstatements on August 3, 2009, that, as Defendant Manouchehr admitted three months later, the other OEMs had not yet started to build ZeusIOPS into their systems.[17]  Nevertheless, on August 3, 2009, not only did the Securities Fraud

---

[17] On November 10, 2008, when a STEC spokesperson described having had "over a year of daily and weekly meetings . . . to optimize the performance of our [ZeusIOPS] products within [our customer's] system, "he was describing what he considered to be standard procedure for sales of ZeusIOPS.  His point was that the need for such a lengthy and intimate cooperation between the SSD seller and its customer was a big barrier to the entry," and as Defendant Manouchehr added, "one of the reasons why you don't see too many competitors come into this market."

Defendants cause STEC to state falsely that sales of ZeusIOPS to the other OEMs were expected to increase during the second half of 2009, but also, they even failed to warn investors that the other OEMS had not yet begun to build ZeusIOPS into their systems.

### iii. IBM Was Only Offering ZeusIOPS as an Option, Not as a Standard Feature

137. Asked by another securities analyst why IBM's ZeusIOPS "ramp is slow," Defendant Manouchehr disclosed for the first time that IBM was only "selling SSDs as an option" rather than as a standard part of the IBM system. He stated:

> "Selling SSDs as an option versus as part of the product is quite difficult . . . If you're going out there and SSD is the first thing that you are offering your customer in terms of an upgrade for your system, that might change their mind."

### iv. Analysts Expressed Surprise

138. The November 3, 2009, disclosures that the other OEMs were not going to increase their ZeusIOPS purchases during the second half of 2009 caught investors by surprise.

139. Thus, a securities analyst's report about STEC issued by Oppenheimer on November 3, 2009, stated that STEC's "results/outlook" for the third/fourth quarters were "worrisome," and that the "Q4 (Dec.) outlook for $101-$103 in rev [was] even more troubling." The analyst went on to say "[t]he trouble is twofold: 1) sell-through at primary customer EMC; 2) longer inception in new business at HPQ/IBM. *Both were linchpins of our Outperform thesis; now they go out of the window."* [Emphasis added]

140. Another securities analyst's report about STEC issued on November 4, 2009 – this one by Wedbush – was titled "Down for the Count After Last Night's Blindsided Knock out Punch; Downgrade to Neutral and Reducing PT to $18." In addition to noting the fact that EMC "had likely built inventory of [STEC's] flagship ZeusIOPS," the report described "Q4 guidance" as

1  "disappointing," and stated "we were ***completely caught off guard*** by the staff in

2  the adoption rates of SSDs and its negative impact to near-term earnings and

3  revenue."

4      141.  Still another securities analyst's report about STEC issued on

5  November 4, 2009 – by B. Riley – focused on both the disclosure about EMC and

6  "sputtering demand from STEC's other enterprise storage customers."  The report

7  noted that

8          "another stumbling block in the period is IBM, which still is expected
to be the next storage customer to embrace SSDs in volume.  IBM . . .

9  is not generating meaningful revenues yet – in part, STEC stated, due
to the fact that ***Big Blue is marketing the drives as an option vs.***

10  ***coming out and leading upgrade sales efforts with SSDs.***"
[Emphasis added]

11      142.  Finally, an analyst's report about STEC by JPMorgan issued on

12  November 18, 2009, noted that, during the Company's November 3, 2009,

13  earnings conference call, "STEC attempted to convey [the] message . . . that

14  enterprise SSD adoption is still in the *early days* of the adoption phase," and that

15  "[a]s a result, we think investors are ***better prepared for more bumps*** along the

16  way *until multiple OEMs beyond EMC take product."*  The report added that

17  "STEC's stock stands to languish pending greater clarity on the EMC and IBM

18  ramps."

19         **e.**    **Investors Were Surprised Again, When The Truth**

20                  **Was More Completely Disclosed On February 23,**
                **2010**

21      143.  On February 23, 2010, during its 2009 fourth quarter and year-end

22  STEC earnings conference call, the Company reported its 2009 fourth quarter

23  ZeusIOPS revenues -- $74 million – which confirmed that sales of ZeusIOPS to the

24  other OEMs during the second half of 2009 had sharply declined from what such

25  sales had been during the first half of 2009; and that ZeusIOPS sales to the other

26  OEMs in the 2009 fourth quarter were no more than 33 % of what such sales had

27  been in the 2009 second quarter.

28      144.  On February 23, 2010, in STEC's fourth quarter/end of year earnings

1   release, and during the 2009 fourth quarter/end of year earnings conference call,

2   the Company issued is revenue guidance for the first quarter of 2010 -- $33 to $35

3   million. That guidance disclosed that ZeusIOPS sales to the other OEMs would

4   not recover even during the 2010 first quarter, and that the Securities Fraud

5   Defendants' misstatement regarding expected growth of such sales during the

6   second half of 2009 was a highly material misstatement, and not just an estimate

7   that had been off by a month or two. In fact, on February 23, 2010, STEC also

8   announced that no revenue from EMC was expected in the 2010 first quarter,

9   which meant that the estimate of $33 to $35 million was an estimate of the total

10  amount of 2010 first quarter revenue that STEC was expecting to receive from its

11  non-EMC customers for all of STEC's products. This was at least $17.8 million

12  less than the amount of non-EMC related revenue that STEC had received during

13  the second quarter of 2009.

14      145.  On February 23, 2010, during STEC's fourth quarter earnings

15  conference call, Defendant Manouchehr acknowledged that the statement in the

16  Offering Prospectus regarding the expected growth in ZeusIOPS sales to the other

17  OEMs had been wrong by *at least* half a year. Thus, a securities analyst noted that

18  "it sounds like you're not expecting any [2010 first quarter] revenue from EMC.

19  But do you expect some revenue from some of your other Zeus customer?"

20  Without any apparent basis, Defendant Manouchehr initially responded that "[o]h

21  the rest of the customers, everyone is growing very slowly." Then, more

22  revealingly, he added, "we put second half of this year as the time to see growth

23  again in this market."

24      146.  Investors were surprised by both the 2009 fourth quarter results and

25  the 2010 first quarter revenue guidance as both of these applied to other OEMs.

26      147.  Thus, on February 24, 2010, a Needham research report on STEC

27  stated it was "revisiting estimates lower once more" because, among other reasons,

28  fourth quarter ZeusIOPS revenue was "below our original estimate." This meant

1    revenue from the other OEMs – not from EMC – was below what Needham had

2    expected, because analysts had known since the third quarter what the amount of

3    fourth quarter revenues from EMC would be, because revenues from EMC for the

4    second half of 2009 had been fixed by the EMC Agreement.

5        148.  On February 24, 2010, JPMorgan lowered its STEC stock price target

6    to $12.50 from $42, after noting that STEC's 2010 first quarter revenue guidance

7    was more than $60 million below JPMorgan's prior estimate.  As was now

8    apparent, after STEC's November 3, 2009, disclosures, investors already knew that

9    EMC would not be purchasing as much as $60 million in the 2010 first quarter, at

10   least a portion of JPMorgan's prior overestimate of STEC's 2010 first quarter

11   revenues had been an overestimate of revenues from the other OEMs.  JPMorgan

12   commented that "the disappearance of sustainable revenue momentum up-ended

13   our prior view" and that "[t]he flow-through effects of this reset are staggering to

14   the overall model, which is why, we are downgrading to Neutral."

    f.    **Too Late to Benefit Plaintiff or Other STEC**
          **Investors, the Securities Fraud Defendants Added a**
          **Key Cautionary Statement to Their Quarterly SEC**
          **Filings**

15

16

17       149.  STEC's 2009 Form 10-K Annual Report was issued on February 23,

18   2010.  In this 10-K, for the very first time, the Securities Fraud Defendants caused

19   STEC to add the following cautionary statement:

20

21            "[O]ur SSDs are currently offered as options in our
              customers' systems.  Therefore, the demand for
22            these SSDs is unpredictable and fully dependent
              on end user requirements.  Unless and until our
23            SSDs are offered as a standard feature in our
              customers' systems, our demand visibility will
              continue to be limited."
24

25       150.  The same statement has appeared in every subsequent Form 10-Q

26   filed by STEC.  Thus, as late as November 2, 2010 – a full fifteen months after the

27   Securities Fraud Defendants issued their false statement in the Offering Prospectus

28   that they expected STEC to make increased sales of ZeusIOPS to the other OEMs

1    during the second half of 2009, the Securities Fraud Defendants were still warning

2    investors that STEC's SSDs were being offered only as "options" rather than as "a

3    standard feature" in the systems of STEC's customers.  Investors who purchased

4    STEC's stock during the Relevant Period, such as Plaintiff, never had the benefit

5    of this warning.

6           **2.    The Offering Prospectus Failed To Disclose That IBM
7                   Would Not Begin Purchasing For Volume Production
                    During The Second Half Of 2009, And Was Not Marketing
8                   ZeusIOPS As A Standard Feature In Its Systems.**

9           151.   Shortly before the start of the Relevant Period, on May 11, 2009,

10   during the Company's 2009 *first* quarter earnings conference call, while talking

11   about IBM's purchases of ZeusIOPS, Defendant Manouchehr stated "we feel that

12   come third quarter, they will go in full production in all of these products."

13          152.   Subsequently, on August 3, 2009, the message that IBM would soon

14   be increasing its purchases of ZeusIOPS was reinforced by a statement in STEC's

15   2009 second quarter earnings release that a "highlight" of the 2009 *second* quarter

16   had been "accelerated adoption of the ZeusIOPS SSDs into major Enterprise-

17   Storage and Enterprise Server OEM customers, including IBM" and several other

18   OEMs.

19          153.   On August 3, 2009, the Securities Fraud Defendants signed and filed

20   the Form S-3 Registration Statement and caused the issuance of the Offering

21   Prospectus, which stated that:

22           "[w]e expect continued growth in the sales of our Flash-based SSD
             ZeusIOPS products *through 2009 based on the accelerated adoption
             of our ZeusIOPS SSDs by most of our major enterprise-storage and
             enterprise-server OEM customers* into their systems."   [Emphasis
             added]

23

24          154.   The Offering Prospectus was deceptive because, in addition to the fact

25   that, as explained, *supra*, the Securities Fraud Defendants did *not* expect ZeusIOPS

26   sales to the other OEMs to increase during the second half of 2009, the Prospectus

27   also failed to disclose that IBM was not expected to reach full production of

28   systems incorporating ZeusIOPS at any time during the second half of 2009 It also

52

1    did not disclose that IBM was offering ZeusIOPS only as an option, and not as a

2    standard feature in its systems, all of which material facts were known to and

3    concealed by each of the Securities Fraud Defendants.

4        155.   For the same reason that, on August 3, 2009, the Securities Fraud

5    Defendants knew that ZeusIOPS sales to the other OEMs were not going to

6    increase during the second half of 2009 – and, in fact, would decline during the

7    second half of 2009 – they also knew that IBM was not going to reach full

8    production of systems incorporating ZeusIOPS at any time during the second half

9    of 2009, and, in fact, would decrease its purchases during the 2009 third quarter.

10       156.   Although, during the Company's 2009 second quarter earnings

11   conference call, which also took place on August 3, 2009, Defendant Manouchehr

12   stated that the other OEMs "are taking a *little bit* longer than expected in terms of

13   full production," he did not disclose the material fact that, as he and the other

14   Securities Fraud Defendants undoubtedly knew, sales to IBM were actually

15   expected to drop during the 2009 third quarter, and that IBM was not expected to

16   reach full production at any time within the second half of 2009.

17       157.   Defendant Manouchehr also failed to disclose that IBM was offering

18   ZeusIOPS only as an "option," and not as a standard feature in its systems, the

19   reason that he subsequently gave when asked during the Company's November 3,

20   2009, third quarter conference call "why [IBM's] ramp is slow."

21       158.   Because of STEC's intimate relationship with its OEM customers –

22   especially with respect to the design of the OEMs' systems – the Securities Fraud

23   Defendants already knew, at the time of the issuance of the Offering Prospectus,

24   that IBM was offering ZeusIOPS only as an "option" and not as a standard feature

25   in their systems.

26       159.   The failure of the Securities Fraud Defendants to qualify the statement

27   in the Offering Prospectus about increased sales to the other OEMs during the

28   second half of 2009 with respect to IBM was not only material but outright

1   intentionally deceptive, as shown by the fact that, subsequent to STEC's issuance

2   of the Prospectus, on September 9, 2009, a JPMorgan securities analyst's report

3   discussing STEC's ZeusIOPS customers stated that "we look for IBM to ramp to

4   volume in 2H 2009."

### 3. STEC's September 10, 2009, Letter to the SEC Falsely Represented That One or More of the Other OEMs Was Ready to Purchase ZeusIOPS in Quantities Equivalent to Those Being Purchased Under the EMC Agreement

160.   On September 10, 2009, in its publicly filed response to the SEC's

inquiries concerning STEC's contracts with EMC, the Company was caused by the

Securities Fraud Defendants to state that "in the unlikely event a customer should

default under a purchase order or other sales agreement, STEC generally believes it

could find a replacement customer for the relevant product."  This statement was

intended to address STEC's then-current sales agreements, as well as STEC's past

sales agreements, as shown by the fact that the statement was made in the present

tense.

161.   This statement was knowingly false when made because, as

subsequently disclosed, during STEC's November 3, 2009, third quarter earnings

conference call, each of the Securities Fraud Defendants knew that none of the

Company's other customers could have replaced EMC under the EMC Agreement.

Thus, during the November 3, 2009, conference call, Defendant Manouchehr

confirmed a securities analyst's statement that STEC's other large customers

besides EMC "aren't selling to any degree yet" and added that they were all "*a

year behind*" EMC.

162.   Moreover, during the Company's November 3, 2009, earnings

conference call, when an analyst asked "are you expecting any other supply

agreements from any of your other qualified customers," Defendant Manouchehr

responded "I would say that IBM would be the next guy that comes along," while

also admitting that IBM's purchases of ZeusIOPS – which had never been

described by STEC as rising to the level of volume production – had "*dropped off*

*significantly* in the third quarter," and that, at present, IBM could not even be

considered a "customer."[18]

### 4. The Securities Fraud Defendants' False Statement About Sun is a Reflection of Scienter with respect to Their Misrepresentations About the Other OEMs, and Their Omissions about IBM

163.   Shortly before the start of the Relevant Period, on May 11, 2009,

during STEC's first quarter earnings conference call, in a series of statements,

Defendant Manouchehr falsely represented that Sun already was in "full

production" of systems incorporating ZeusIOPS.

164.   First, Defendant Manouchehr stated that all of the five biggest

enterprise storage OEMs had qualified ZeusIOPS, including EMC, Sun, IBM, HP

and Hitachi.

165.   Second, Defendant Manouchehr stated that "for now we only have

*two* customers in full production.

166.   Third, and finally, Defendant Manouchehr stated that IBM, Hitachi

and HP "are not in full production."

167.   Each of the other Securities Fraud Defendants knew or should have

known that the foregoing statements were deceptive. As a result of these

statements, investors could only conclude that EMC and Sun were *both* in "full

production" of systems incorporating ZeusIOPS.  For example, on May 12, 2009,

an analyst report about STEC published by Oppenheimer stated that "EMC and

Sun has [sic] started volume production of ZeusIOPS-based storage servers."  Also

on May 12, 2009, another analyst report about STEC, published by Capstone

Investments, stated that "[c]urrent momentum is being driven primarily by two

---

[18]   Defendant Manouchehr stated "you can't have very good visibility with having one single customer. . . . we'll get to extremely good visibility once the IBMs [and other OEMs besides EMC] come along and start building in SSDs into their systems."

1    current customers (SUN/EMC)."

2         168.   Information provided by a knowledgeable confidential witness

3    referred to in the Securities Litigation establishes that Defendant Manouchehr's

4    statements on May 11, 2009, about Sun already having started "full production" of

5    systems incorporating ZeusIOPS were knowingly false when made.

6         169.   Such Confidential Witness was stated to be an employee at Sun from

7    January 1999 through June 2009. From January 2005 through June 2009, he was

8    said to be Sun's Chief Technologist for Storage and Data Management. According

9    to what is attributed to him in the Securities Litigation, in the Spring of 2009, Sun

10   purchased less than 100 Zeus SSDs from STEC, at approximately $1,000 per unit –

11   a total purchase of only $100,000 – for use solely for testing and development in

12   Sun's series 7000 Unified Storage System. According to such witness, up until his

13   departure from Sun, at the end of June 2009, Sun had never ordered ZeusIOPS for

14   volume production.

15        170.   Given the importance of ZeusIOPS to STEC, Defendant

16   Manouchehr's key role at STEC and his comprehensive knowledge of STEC's

17   ZeusIOPS business – as demonstrated during STEC's earnings conference calls –

18   he cannot have been unaware that his statement about Sun was false.

19        171.   Defendant Manouchehr's subsequent efforts to disguise the falsity of

20   his statements during the 2009 first quarter earnings conference call further

21   supports his wrongful intent with respect to these false statements.

22        172.   Thus, during STEC's 2009 second quarter earnings conference call,

23   while investors were distracted by the news regarding the EMC Agreement,

24   Defendant Manouchehr dropped his assertion that *two* of STEC's customers were

25   in full production – without acknowledging that he was saying anything new – and

26   stated that "one customer [is] in production, four customers are *still in pre*

27   *production*."

28        173.   Still later, during STEC's 2009 third quarter earnings conference call,

when he was forced to admit that ZeusIOPS sales to the OEMs other than EMC
had declined, Defendant Manouchehr gave a purported explanation about the lack
of ZeusIOPS sales to Sun that essentially reiterated his previous false statement
that Sun had been ordering ZeusIOPS for full production.

> "In terms of **Sun, obviously Sun has been a very**
> **large customer for us over the past few quarters.**
> We've hit a snag with a deal [*i.e.*, a merger] that
> they are involved in at this point. And once that
> gets through – solved, we feel that we'll be back to
> normal volumes that we have been doing."
> [Emphasis added]

174.  Defendant Manouchehr's willingness to knowingly make false
statements about Sun, both before and during the Relevant Period, provides
additional support with respect to his wrongful intent regarding STEC's false
statement in the Offering Prospectus that the Company expected increased sales to
the OEMs other than EMC during the second half of 2009, and for STEC's
omission to qualify the statement in the Prospectus specifically as it regarded IBM.

### D.    The Securities Fraud Defendants Artificially Inflated STEC's 2009 Second Quarter Revenues

175.  The Securities Fraud Defendants marketed STEC to investors as, first
and foremost, a "growth" company – *i.e.*, a company producing steady revenue
growth.  Thus, in each of its Form 10-Qs filed with the SEC during the Relevant
Period, STEC stated at an early point in "Management's discussion and analysis of
financial condition and results of operations" that STEC is "focusing on certain
revenue growth initiatives."  Thus too, in its earnings releases for each of the first
three quarters in 2009, in order to stress the continuing growth of its revenues,
STEC compared its quarterly revenues, not only to its revenues from the previous
year's same quarter, but also to its revenues from the immediately preceding
quarter.

176.  After failing to do so in the fourth quarter of 2008, STEC's reported
revenues increased in the 2009 first quarter of 11.6%.  On May 11, 2009, at the
same time that STEC reported its first quarter results, it also predicted that 2009

57

1    second quarter revenues would increase again, this time by 7%-10%. Investors

2    responded to such reported results by bidding up STEC's stock price by 31%.

3        177.   When investors are expecting a company to continuously report

4    revenue growth, a decline in the rate of growth or even a continuation of the same

5    rate of growth, particularly for a company such as STEC, may not be enough to

6    keep the company's stock price rising, or even enough to prevent it from falling.

7    Thus, despite the 2009 first quarter revenue growth reported by STEC on May 11,

8    2009, one month later, on June 10, 2009, an analyst's report about STEC by B.

9    Riley *downgraded* STEC to "neutral," starting, "we believe that easy money has

10   been had, and now is a good time to take some STEC off the table."

11       178.   Less than a week after the B. Riley downgrade, on June 16, 2009,

12   perhaps in response to it, STEC issued a press release announcing that it was

13   increasing its 2009 second quarter revenue guidance by an additional $14 million –

14   so that second quarter revenue was now predicted to exceed first quarter revenue

15   by 29%-32%. Later in the year, on November 2, 2009, looking back, a Capstone

16   analyst's report would note, that "[p]reviously during '09, when investor

17   expectations turned more bearish STEC management delivered increased estimate

18   expectations (June '09)."

19       179.   As was also true for every other quarter in 2009, the amount of

20   revenue that STEC ultimately reported for the 2009 second quarter slightly

21   exceeded STEC's final "guidance" for the quarter. As a result of meeting and

22   slightly exceeding the guidance that STEC issued on June 16, 2009, STEC was

23   able to report record revenue growth in the quarter that ended just prior to the

24   Offering. In fact, STEC's 2009 second quarter revenue was reported on the same

25   day that the Offering was announced.

26       180.   As explained further, *infra*, the Securities Fraud Defendants were able

27   to increase  STEC's 2009 second quarter revenue guidance by $14 million because

28   at the time when the Company issued its increased guidance for the 2009 second

quarter, they were taking steps to generate $14 million worth of unearned income and undisclosed "channel stuffing" by manipulating STEC's second quarter deliveries to the other OEMs, and then manipulating the accounting for those deliveries.  The manipulation of STEC's second quarter deliveries to the other OEMs is shown by the statements of confidential witnesses known to plaintiff's counsel in the Securities Litigation who were employed at STEC during the 2009 second quarter.  The fact that these manipulated deliveries were used to increase STEC's 2009 second quarter reported revenue with $14 million of unearned income and undisclosed "channel stuffing" is shown by the fact that, subsequent to the 2009 second quarter, revenue from the other OEMs plunged, and it plunged by exactly $14 million – the same amount by which the Securities Fraud Defendants had increased STEC's 2009 second quarter guidance.

**1.    The Securities Fraud Defendants Caused STEC's 2009 Second Quarter Revenue to be Artificially Inflated by Recording Unearned Income and by "Channel Stuffing"**

181.   As stated in the Securities Litigation, information provided by confidential witnesses who worked at STEC during the 2009 Second Quarter shows that, during the 2009 second quarter, STEC's shipments to its customers other than EMC involved practices generally used to facilitate inflating reported revenues, including the methodical generation of unearned income,[19] and undisclosed "channel stuffing."

---

[19]   Under the SEC's Staff Accounting Bulletin No. 104 ("SAB 104"), which interprets FASB Concepts Statement No. 5 ("Con 5"), which, in turn, summarizes GAAP rules regarding revenue recognition, "revenue should not be recognized until it is realized or realizable and earned," and such a condition does not exist unless "delivery has occurred or services have been rendered" **and** "collectability is reasonably assured."  Under SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with Generally Accepted Accounting Principles [GAAP] will be presumed to be misleading or inaccurate."  17 C.F.R. §210.4-01(a)(1).  Each of STEC's Form 10-Q filed during 2009 also contained a statement that "the accompanying interim condensed consolidated financial statements of STEC . . . have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information."

59

182.   In the Securities Litigation, a Confidential Witness who is stated to have worked at STEC from June 2004 until July 2009, including through the entire 2009 second quarter, was coordinator of sales to Hewlett-Packard and in 2009 reported to Lorenzo Salhi, who reported directly to Defendant Manouchehr.

183.   This witness apparently has stated that STEC sent HP defective products and falsified the failure rate in order to make STEC's sales numbers for the second quarter of 2009. When STEC tested the modules, 35 (or about 10%) failed. According to the witness, Mr. Salhi replaced the failed modules and returned them to HP in May or June of 2009, with a report that falsely stated only two of the units had failed. HP shipped these modules to its customers, where they again failed. The witness is quoted as saying that the modules were shipped back to HP because STEC needed to make its numbers for that month or quarter. According to the quoted witness, Defendant Manouchehr told Mr. Salhi, "I don't care what you have to do, get those modules back to HP."

184.   Another way in which unearned income was created for STEC by sending customers unwanted product. For example, the witness is said to have reported than when Hewlett-Packard received from STEC a shipment in which 10% of the products failed, HP placed STEC on a "world wide stop shipment" hold. Defendant Manouchehr nonetheless ordered that replacement product be shipped to HP. According to the witness, the modules were shipped to HP in May or June of 2009 because STEC needed the sales that month/quarter. When HP received the modules, HP's procurement engineer "hit the roof" and said that STEC should not have shipped them.

185.   Although STEC's 2009 10-K Annual Report admits that "product returns would increase our inventory and reduce our revenues," the Securities Fraud Defendants never caused the disclosure of the circumstances surrounding such returns or their impact upon reported revenues or that such returns were an integral part of the Securities Fraud Defendants'' manipulation of STEC's reported

1   revenues and earnings.

2       186.   According to another witness cited in the Securities Litigation, still

3   another deceptive practice used by STEC to create unearned revenues was to "ship

4   bricks," or empty boxes, so that they could record revenue from those phantom

5   shipments to meet revenue goals.  This Confidential Witness, who was stated to be

6   a STEC Field Application and Sales Engineer from September 2007 until

7   November 2009, including during the entire 2009 second quarter, confirmed that it

8   was STEC's practice to engage in "shipping bricks" or wrong product to

9   customers.

10      187.   A witness also apparently provided information to the effect that

11  senior management of the Company also artificially inflated STEC's revenue by

12  pressuring customers to advance into current quarter their purchases of product that

13  they would not need until a later quarter, and by failing to disclose this "channel

14  stuffing" to investors. Thus, a witness reported that Defendant Manouchehr

15  directed the witness' superior, Lorenzo Salhi, to pull all sales of products to Cisco

16  from a future quarter in 2009 to an earlier quarter.

17      188.   This witness is quoted as having stated that she was told by a Sales

18  Director, who reported to Defendant Manouchehr and who attended sales meetings

19  with him, that at those sales meetings, Defendant Manouchehr would tell everyone

20  to push sales from a future quarter to the present quarter.  This was done to make

21  the current quarter look good. This witness apparently stated that Defendant

22  Manouchehr "had his hands on everything when it came to sales."

23      189.   The witness is further quoted as stating that she was told by a STEC

24  salesperson, who worked in Houston on the HP account and reported to Lorenzo

25  Salhi (and who was in charge of Cisco sales), that "Cisco must take everything this

26  quarter" because he wanted "grand numbers" that quarter.

27

28

### 2. The Collapse of STEC's Revenue in the 2010 First Quarter Shows That the Company's 2009 Second Quarter Revenue Was Inflated by $14 Million Regarding Sales to Customers Other than EMC

190. After the 2009 second quarter, STEC's revenue growth slowed significantly, from 36% in the second quarter, to 14% in the third quarter, to 7% in the fourth quarter. Finally, in the first quarter of 2010, STEC's revenue collapsed, dropping 63.4% to $38.8 million.

191. STEC's 2009 fourth quarter earnings release conceded that STEC did not expect "any meaningful production orders" from EMC during the 2010 first quarter. Thus, STEC's 2010 first quarter revenue represents the amount of the Company's revenue obtained from sources other than EMC, and in the absence of such revenue inflating activities as the confidential witnesses observed during the second quarter of 2009.

192. Based on the statement in STEC's Form 424B3 filed on August 3, 2009, that EMC accounted for 38.9% of the Company's 2009 second quarter revenue, STEC's 2009 second quarter revenue derived from sources *other* than EMC was $52.8 million. This is precisely $14 million more than the revenue from non-EMC sources reported by STEC in the 2010 first quarter.

193. The $14 million by which STEC's reported revenue for the 2009 second quarter exceeds the Company's reported revenue for the 2010 first quarter is exactly equal to the amount by which the Securities Fraud Defendants had caused the Company to increase its 2009 second quarter revenue guidance on June 16, 2009.

194. This remarkable symmetry is strong evidence that STEC's 2009 second quarter revenue was knowingly inflated by the Securities Fraud Defendants by $14 million using the techniques reported by the confidential witnesses referred to in the Securities Litigation.

### 3. The Securities Fraud Defendants Inflated STEC's Revised 2009 Second Quarter Revenue Guidance

195.   Before the market opened on June 16, 2009 (the beginning of the Relevant Period), the Securities Fraud Defendants caused STEC to issue a press release announcing a $14 million increase in revenue guidance for a second quarter of 2009.  First quarter revenue had been $63.5 million, previous guidance for the second quarter was $68-$70 million, and the increased second quarter guidance was for revenue of $82-$84 million – an increase of $14 million.

196.   On STEC's June 16, 2009 announcement, the price of the Company's stock increased 27% in a single day to close at $22.88 per share, a $4.86 increase from the prior day's closing price of $18.02, an extraordinarily high trading volume of 10.4 million shares.  For the same reasons as explained, *supra*, showing that the revenue subsequently reported for the second quarter of 2009 was inflated by $14 million, so too this revenue was inflated, and, therefore, knowingly false.

## V.   ADDITIONAL ALLEGATIONS OF SCIENTER

### A. After Inflating the Price of STEC's Stock,  the Moshayedis Engaged in Massive Insider Selling

197.   After artificially inducing a doubling of the price of STEC stock from $18.02 per share on June3 16, 2009 to $35.50 per share on August 11, 2009 through illegal and/or otherwise deceptive means, and with specific knowledge of such manipulation, Defendants Manouchehr and Mark unloaded nine million shares of STEC common stock.[20]  This sale reaped a windfall for the Company's top two executives of $267.8 million in a single day, while their collective ownership of the Company decreased from 35.5% to 17.4%.

198.   The Moshayedis' stock sell-off was the biggest insider stock

---

[20]  Forms 4 filed by Defendants Mark and Manouchehr on August 13, 2009, list August 11 as the "Transaction Date" for the sale of all nine million shares.  The Offering was announced on August 3, 2009, priced on August 6, 2009, and closed on August 11, 2009. Defendant Mike and the Trust Defendants also sold a large portion of their  STEC shareholdings.

1   liquidation in the history of STEC, and a departure from the pattern of their other

2   recent sales of STEC stock. Defendant Manouchehr sold no stock in 2008 and sold

3   only 400,000 shares in March 2009 for proceeds of $3 million.  Defendant Mark

4   sold only 466,292 shares in June 2008 and another 400,000 shares in March 2009,

5   for proceeds of $6.5 million and $3 million, respectively.  The number of shares

6   sold by the Moshayedis in the Offering was collectively more than eleven times the

7   number of shares they sold in the six months before the Relevant Period and nearly

8   twenty times the number of shares they sold in all of 2008.

9        199.   The Moshayedis had been planning to sell STEC stock since shortly

10   before making the first of their alleged misstatements and omissions.  Thus, on

11   May 29, 2009, without mentioning anything about the magnitude of the STEC

12   shares that would be sold, a STEC press release stated that Defendants

13   Manouchehr and Mark had adopted "pre-arranged stock trading plans" under Rule

14   10b5-1 to sell a portion of their stock "over a period of 18 months."

15   Approximately two weeks later, in furtherance of their plan and scheme to proceed

16   with the Offering based upon artificially manipulated market prices, the Securities

17   Fraud Defendants caused the Company to make the first misstatement during the

18   Relevant Period, when STEC issued its revised 2009 second quarter revenue

19   guidance.[21]

20        200.   After the Securities Fraud Defendants had issued or caused to be

21   issued their string of misstatements and the price of STEC's stock had doubled, on

22   August 3, 20098, during STEC's second quarter earnings conference call,

23   Defendant Cook announced that the Moshayedis had cancelled their 10b5-1 plans,

24   and would sell their stock in a single secondary offering – which closed eight days

25

26   [21] The Moshayedis' retired brother, Defendant Mike, STEC's former President,
      sold $25 million of his stock in the Company in June and July 2009, beginning the
27   day after STEC issued its increased and falsely generated second quarter revenue
      guidance.  Within one week after the announcement, Defendant Mike and his Trust
28   unloaded over one million STEC shares.

1    later.

2        201.   Subsequently, after the November 3, 2009, disclosures a commentator

3    on the much-followed Seeking Alpha website observed that "the market found it

4    too coincidental that top management made such a substantial sale of stock in the

5    very quarter they blew up."

6        202.   During the November 3, 2009, conference call, another analyst asked

7    Defendant Manouchehr "are you considering buying any [of the stock] back?"

8        203.   Still later, after the February 23, 2010, disclosures and the collapse of

9    STEC's stock price to $10.27, a *Barron's* article sarcastically observed that the

10   Moshayedis now "look[] prescient" for having "sold 9 million shares – at $31 a

11   piece."

12   **B.   As STEC's Stock Price Began to Collapse, the SEC Launched a Formal Investigation of the Moshayedis' Stock Sales**

13       204.   Following STEC's November 3, 2009, disclosures, the SEC instituted

14   a formal investigation into insider trading at STEC.  The Company's 2009 Form

15   10-K, filed on February 23, 2009, disclosed for the first time:

16       "The [SEC] is conducting a formal investigation involving trading in our securities.  Certain of our officers and employees, including our CEO [Manouchehr] and President [Mark], have received subpoenas in

17       connection with the SEC's investigation."

18   On July 19, 2012, the SEC commenced the SEC Litigation against Defendant

19   Manouchehr, alleging violations of the federal securities laws for the reasons

20   alleged herein.

21   **C.   Only Days After Disclosing the SEC Investigation, STEC Made Golden Parachutes Available to the Individual Defendants**

22       205.   On February 26, 2010, just a few days after STEC informed the public

23   that certain of its officers were under investigation by the SEC, the Company

24   announced that it had terminated its existing Severance and Change in Control

25   Agreements that provided additional benefits for the members of STEC senior

26   management should they be terminated without cause or should they terminate

27   their own employment after a change in control at the Company.  These benefits

28

1    included so-called "golden parachutes" – a prorated annual bonus and accelerated

2    vesting of stock options – if they leave the Company within twelve months for a

3    change of control. Such "golden parachutes" were *de facto* bribes to the affected

4    members of management to protect against the knowledge that they had about the

5    Securities Fraud Defendants' wrongdoing being revealed publicly.

### D. Each of the Securities Fraud Defendants' False Statements and Omissions Involved One of STEC's Core Operations

206.   Each of the Securities Fraud Defendants, by reason of his position as a

senior-most officer and/or director of the Company, was involved in STEC's daily

operations and/or had access to all material information regarding the Company's

core operations.  Therefore, each of the Securities Fraud Defendants is presumed to

have had knowledge of all material facts regarding STEC's core operations that

were concealed from the public or misrepresented.

207.   Each of the false statements alleged herein involved a core operation

of STEC.

208.   During the Company's August 3, 2009, earnings conference call,

Defendant Cook referred to ZeusIOPS as STEC's "signature" product.  During the

same conference call, Defendant Manouchehr made statements showing that STEC

was forecasting ZeusIOPS revenue for the 2009 third quarter to comprise between

69% and 72% of STEC's total revenue. Each of the other Securities Fraud

Defendants knew or should have known that such statements were false and

intended to be misleading to the investing public.

209.   EMC was STEC's principal customer.  According to STEC's Form

424B3 filed on August 3, 2009, during the second quarter of 2009, EMC accounted

for 38.9% of all STEC's revenues.  During the November 3, 2009, conference call,

Defendant Manouchehr stated "EMC still remains our top customer" and that EMC

accounted for 90% of ZeusIOPS sales.

210.   STEC considered the other OEMs to be potentially as important to

STEC as EMC. Thus, during the August 3, 2009, conference call, Defendant Manouchehr referred to five top OEM customers, including EMC, as "low hanging fruit," and stated that "[w]e've only picked one fruit at this point, and there are four more fruits left."

211.   The Securities Fraud Defendants marketed STEC to investors as, first and foremost, a "growth" company – *i.e.*, a company producing steady revenue growth. STEC posted on its website an article by Paul Shread, published on August 4, 2009, stating that "[t]he most interesting detail to come out of STEC's quarterly earnings report last night [*i.e.*, on August 3, 2009] is just how much growth may still lie ahead for the enterprise solid state (SSD) drive maker."

**E.    Each Officer Defendant Had a Motive and Opportunity to Commit Fraud**

212.   Defendants Manouchehr and Mark each had a motive to commit fraud in order to reap his roughly half share of the $267.8 million obtained from the Offering. Of the 9 million shares sold in the Offering, 4.9 million were Defendant Mark's and roughly 4.1 million were Defendant Manouchehr's, separate and distinct from the STEC shares sold by Defendant Mike.

213.   Defendant Cook had a motive to commit fraud in order to please the Moshayedis and to retain his position with the Company. Defendant Cook had been hired by STEC only nine months before the Offering – and, unlike the Moshayedis, was neither a direct nor a major shareholder.[22] He therefore had a motive to curry favor with these two brothers who had founded the firm, and who, individually and together, represented unrivaled sources of influence and control within the Company.

214.   As the Company's most senior officers, and for the other reasons detailed herein, Defendants Manouchehr, Mark and Cook had a clear opportunity to commit fraud and did so.

---

[22] At the time of the Offering, Defendant Cook did not own any STEC stock.

215.   Although not an officer of the Company, Defendant Bahri, as a Director and Chair of the Board's Audit Committee, was beholden to the Moshayedis for his position and its perquisites and emoluments and thus acquiesced in their wishes and "rubber stamped" everything they did.

**VI.   THE SECURITIES FRAUD DEFENDANTS' FALSE AND MISLEADING STATEMENTS VIOLATED THE EXCHANGE ACT**

216.   On June 16, 2009, the first day of the Relevant Period, the Securities Fraud Defendants caused STEC to issue a press release containing revenue guidance for the 2009 second quarter of "82-84 million."   As previously indicate, *supra,* this was an increase of $14 million over the previous guidance issued for the 2009 second quarter.

### A.   July 16, 2009 Press Release

217.   On July 16, 2009, the Securities Fraud Defendants caused STEC to issue a press release stating that STEC had signed an agreement with "one of its largest enterprise storage customers for sales of $120 million of ZeusIOPS SSDs in the second half of 2009."   The press release also quoted Defendant Manouchehr's statement that the agreement had been made possible by the fact that "sales of [the purchaser's] enterprise storage system utilizing our Zeus IOPS drives have grown significantly."

### B.   August 3, 2009, SEC Filings

#### 1.   2009 Second Quarter Earnings Release

218.   On August 3, 2009, STEC was caused to issue its 2009 second quarter earnings release which stated that the Company had signed a "$120 million contract to supply ZeusIOPS SSDs to a major Enterprise-Storage customer for the second half of 2009."

219.   STEC's 2009 second quarter earnings release also reported second quarter revenue of $86.4 million, and failed to disclose what each of the Securities Fraud Defendants knew or should have known that $14 million of this total was

comprised of unearned income and undisclosed "channel stuffing."

### 2. Form 424B3 (The Offering Prospectus)

220. On August 3, 2009, STEC filed a Form 424B3, the Offering Prospectus, stating, among other things:

> "We expect continued growth in the sales of our Flash-based SSD ZeusIOPS products through 2009 based on the accelerated adoption of our ZeusIOPS SSDs by most of our major enterprise-storage and enterprise-server OEM customers into their systems."

The foregoing passage was a misstatement or material fact concerning the other OEMs, of which each of the Securities Fraud Defendants was or should have been aware. The foregoing passage also intentionally omitted material facts concerning IBM.

221. The passage quoted above also was part of the following, longer passage, which was a misstatement/omission regarding the EMC Agreement:

> "We expect continued growth in sales of our Flash-based SSD ZeusIOPS products through 2009 based on the accelerated adoption of our ZeusIOPS SSDs by most of our major enterprise-storage an enterprise server OEM customer into their systems. As part of this expected growth, on July 16, 2009 we announced an agreement with one of our largest enterprise-storage customers for sales of $120 million of ZeusIOPS SSDs to be delivered in the second half of 2009."

### 3. Second Quarter 10-Q

222. On August 3, 2009, STEC was caused by the Securities Fraud Defendants to file its 2009 second quarter 10-Q, which reported revenue for the second quarter of $86.4 million, and failed to disclose that $14 million of this total was comprised of unearned income and undisclosed "channel stuffing."

### C. September 10, 2009, Publicly Filed Letter to the SEC

223. On September 10, 2009, STEC publicly filed with the SEC a letter to the SEC, signed by Defendant Cook, stating that "in the unlikely event a customer [of STEC] should default under a purchase order or other sales agreements [with

STEC], STEC generally believes it could find a replacement customer for the relevant product."

## VII.  LOSS CAUSATION ALLEGATIONS RELATING TO THE EXCHANGE ACT CLAIMS

### A.     The November 3, 2009, Partial Corrective Disclosures

224.   In reaction to multiple partial corrective disclosures made after the market closed on November 3, 2009, shares of STEC common stock plunged $9.01 per share to close at $14.14 per share on November 4, 2009, a one-day decline of 39% on extraordinary volume of 32 million shares.

#### 1.     Disclosure That The EMC Agreement Was Not an Ordinary Course Contract Indicative of Purchases by EMC Expected to Recur

225.   One substantial cause of the November 4, 2009, stock price decline was the disclosure that the $120 million EMC Agreement was a "one off" contract that had satisfied EMC's requirements for more than just the second half of 2009, and not an ordinary course of business contract indicative of a new, higher volume of recurring purchases by EMC.

226.   Thus, on November 4, 2009, in a report entitled, *"Down for the Count After Last Night's Blindsided Knock Out Punch,"* Wedbush slashed its STEC stock price target to $18 from $39 per share "following STEC's surprising revelation last night on its Q3 earnings call that its leading SSD customer (EMC) had likely built inventory of its flagship ZeusIOPS, "and cut its rating to "Neutral" from "Outperform."  Earlier that same day, but prior to STEC's startling disclosure, Wedbush had reiterated an "Outperform" rating for STEC and assigned at $39 price target, emphasizing STEC's strong demand for ZeusIOPS at its leading Tier 1 customer EMC."

227.   On November 3, 2009, Oppenheimer slashed its STEC stock price target in half to $21 to $45, said "we would not be surprised if bears pounce,"

downgraded STEC from "Outperform" to Perform," and explained that "[t]he trouble is twofold," with one of the two problems being "sell-through at primary customer EMC."

228.   Also on November 4, 2009, a *Barron's* article titled "STEC crushed by EMC issue; three bullish analysts give up," stated that "STEC shares are being ravaged today after the company warned investors yesterday that excessive inventory of ZeusIOPS solid-state drives sold to customer EMC could hurt demand in the early part of 2010."

229.   On November 16, 2009, a commentator on the Seeking Alpha internet site concluded that a "major reason" for the "market reaction" to the November 3, disclosure regarding EMC was the appearance that a fraud had been perpetrated by STEC's management:

> ***"Concern over management integrity and credibility***:
> Whether management knew about the demand/inventory issue in advance or not, **the market found it too coincidental** that top management made such a substantial sale of stock in the very quarter they blew up."

### 2.   Disclosure That Sales to the Other OEMs Were Not Expected to Increase During the Second Half of 2009

230.   A second substantial cause of the November 3, 2009, stock price decline was the disclosure that ZeusIOPS sales to the other OEMs were not expected to increase during the second half of 2009.

231.   Thus, a November 4, 2009, report by ABC *News/Money* led with the statement that "Shares of STEC, Inc. tumbled ahead of regular trading Wednesday after the company gave a weak outlook for the rest of the year," noting that revenue for the 2009 third quarter was "up, but "the company's revenue forecast for the rest of the year fell short [of what] analysts polled by Thomson Reuters were looking for." Because the market had known since the 2009 third quarter essentially what EMC's purchases would be in the 2009 fourth quarter (because they had been determined by the EMC Agreement), it was the disclosure of the

1  falsity of STEC's stated expectation regarding fourth quarter sales to the other

2  OEMs that had caused the drop in STEC's stock price, according to this report.

3  232.  Similarly, the Oppenheimer report issued late on November 3, 2009,

4  which slashed its STEC stock price target in half to $21 from $45, said "[t]he

5  trouble is twofold: 1) self-through at primary customer EMC; and 2) *longer*

6  *inception in new business at HP/IBM.  **Both**** were linchpins of our Outperform

7  thesis; now they go out the window."

8  233.  Similarly, on November 4, 2009, JPMorgan cut its STEC stock price

9  target from $50 to $42, and stated that "STEC's stock stands to languish pending

10  greater clarity on the EMC and IBM ramps."

11  234.  As well, the November 4, 2009, *Barron's* article, which led with a

12  statement about the EMC Agreement, stated in its second sentence, "Adding to the

13  pressure, the company warned on its post-earnings conference call that business

14  has been slow as well at both IBM and Sun Microsystems."

15  235.  The November 4, 2009, Wedbush report which slashed its STEC

16  stock price target from $39 to $18 also saw the EMC issue as part of a bigger

17  problem involving STEC's other customers as well. The report focused on

18  "disappointing top line Q4 guidance," stated "we were completely caught off guard

19  by the stall in the adoption rates of SSDs and its negative impact to near-term

20  earnings and revenue," and advised that "investors move to the sidelines" until

21  there is greater visibility on, among other things, "customers production ramps" –

22  using the plural "ramps."

23  **3.  Disclosure That IBM Was Not Expected to Begin Purchasing for
Volume Production in the Second Half of 2009, and Was Not
24  Offering ZeusIOPS as a Standard Feature in Its Systems**

25  236.  A third substantial cause of the November 3, 2009, stock price decline

26  was the belated disclosure that the Securities Fraud Defendants who controlled all

27  of STEC's public communications had no expectation that IBM would commence

28  volume production of a ZeusIOPS during the second half of 2009, and that IBM

72

1   was not selling ZeusIOPS as a standard feature in its systems.

2       237.   On November 4, 2009, a B. Riley report on STEC that stated it was
3   "taking down our numbers somewhat" focused on two primary concerns: the first
4   was the disclosure that EMC had "excess" ZeusIOPS inventory, and the second
5   was that "IBM, which still is expected to be the next storage customer to embrace
6   SSDs in volume . . . is not generating meaningful revenues yet – in part, STEC
7   dated, due to the fact that Big Blue is marketing the drives as an option vs. coming
8   out leading upgrade sales efforts with SSDs."

9       238.   As well, on November 4, 2009, a JPMorgan report that cut that
10  analyst's STEC stock price target also stated that the two issues depressing the
11  stock price were the need for "greater clarity on the EMC and IBM ramps."

12      239.   Similarly, the November 4, 2009, *Barron's* article stated that
13  "[a]dditional pressure" on the price of STEC's stock price was the result of the
14  report that "business has been slow as well at both IBM and Sun Microsystems."

### 4.   Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement

16      240.   A fourth substantial cause of the November 4, 2009, stock price
17  decline was the belated disclosure that, contrary to the statement in STEC's
18  September 10, 2009, letter to the SEC, no other customer could replace EMC
19  under the EMC Agreement, or, more generally, purchase ZeusIOPS at volumes
20  similar to those being purchased by EMC under the Agreement. During the
21  Company's November 3, 2009, conference call, Defendant Manouchehr confirmed
22  an analyst's statement that STEC's other large customers besides EMC "aren't
23  selling to any degree yet" and added that they were all "*a year behind*" EMC.
24  Defendant Manouchehr also disclosed that the customer most likely to make the
25  next agreement similar to the EMC Agreement, namely, IBM, was not anywhere
26  close to making such an agreement, that sales to IBM actually had declined during
27  the third quarter, and that IBM was still offering ZeusIOPS as a mere option rather

28

1   than a standard part of its systems.

2      241.   Thus, a November 4, 2009, report on STEC by ThinkEquity LLC

3   downgraded STEC from "Buy" to "Hold," while noting that, as Defendant

4   Manouchehr belatedly admitted during the November 3, 2009, conference call, the

5   "other Storage OEMs [are] almost a year behind EMC in adopting SSDs."

6      242.   Similarly, a November 4, 2009, B. Riley report states it was "taking

7   down our [valuation] numbers somewhat," after discussing the fact that IBM, was,

8   as Defendant Manouchehr had stated during the Company's November 3, 2009,

9   conference call, still "expected to be the next storage customer to embrace SSDs in

10   volume . . . but is not generating meaningful revenues yet – in part, STEC stated,

11   due to the fact that Big Blue is marketing the drives as an option vs. coming out

12   and leading upgrade sales efforts with SSDs."

13      **B.**    **The February 23, 2010, Additional Corrective Disclosures**

14      243.   In reaction to the multiple corrective disclosures after the market

15   closed on February 23, 2010, the price of STEC common stock dropped over 23%

16   in trading on February 24, 2010, a decline of $3.15, on extraordinary volume over

17   36 million shares.

18      **1.**    **Additional Disclosure That the EMC Agreement Did Not Represent a New Recurring Level of EMC Purchases**

19      244.   One substantial cause of the February 24, 2010, stock price decline

20   was STEC's disclosure that it did not expect "any meaningful production orders"

21   from EMC during the first half of 2010. Each of three different securities analysts

22   lowered their STEC stock price targets while explaining that, whereas they

23   originally had believed that the EMC agreement represented EMC's recurring

24   requirements for ZeusIOPS every six months, they now realized that EMC's

25   recurring requirements were only half that much.

26      245.   Thus, on February 24, 2010, Oppenheimer stated that "now that

27   EMC's supply contract with STEC for $120M is indicative of a full-year run rate

28   vs. half year we are . . . dropping our [price target] to $10 from $21."

246.   Similarly, on February 24, 2010, B. Riley lowered its STEC stock target price from $29 to $16.38, while explaining that "this order was envisioned as meeting six months of demand," but "STEC's new guidance indicates that it expects EMC to take at least a whole year to work through its $120MM July 2009 order for ZeusIOPS SSDs."  In a comment reflection suspicion of STEC management, the report added "[g]iven the drastic difference between actual and expected end-customer demand, we have to wonder why STEC didn't work with EMC and spread shipments over a longer time period – minimizing the disruption all the way around."

247.   Similarly, on February 23, 2010, Deutsche Bank lowered its STEC stock price target to $10 from $36, while stating "[w]e now see EMC revenue of roughly $35M/Q in F2H-10, which we believe has been EMC's true demand over the past few Qs."

### 2.   Additional Disclosure That the Other OEM's Would Not Be Increasing Their Purchases During the Second Half of 2009

248.   A second substantial cause of the February 24, 2010, stock price decline was STEC's belated disclosure that its ZeusIOPS sales to its customers other than EMC during the fourth quarter of 2009, and indeed, during the entire second half of 2009, were far below their quarterly level during the first half of 2009, and were not expected to recover even in the 2010 first quarter.

249.   Thus, on February 24, 2010, a Needham report on STEC stated it was "[r]evising estimates lower once more" because, among other reasons, fourth quarter ZeusIOPS revenue was "below our original estimate."  This meant revenue from the other OEMs – not from EMC – was below what Needham had expected, because its securities analyst had known since the third quarter what the amount of fourth quarter revenues from EMC would be, because revenues from EMC for the second half had been fixed by the EMC Agreement.

250.   Similarly, on February 24, 2010, JPMorgan lowered its STEC stock

1    price target to $12.50 from $42, after noting that STEC's 2010 first quarter revenue

2    guidance was more than $60 million below JPMorgan's prior estimate.  Because,

3    after STEC's November 3, 2009, disclosures, investors already knew that EMC

4    would not be purchasing as much as $60 million in the 2010 first quarter, at least a

5    portion of JPMorgan's prior overestimate of STEC's 2010 first quarter revenues

6    had been an overestimate of revenues from STEC's customers other than EMC.

7    JPMorgan commented that "the disappearance of sustainable revenue momentum

8    up-ended our prior view" and that "[t]he flow-through effects of this reset are

9    staggering to the overall model, which is why we are downgrading to Neutral."

10                    **3.    Additional Disclosures That IBM Was Not Expected to
                              Begin Purchasing for Volume Production in the Second
11                            Half of 2009**

12        251.   A third substantial cause of the February 24, 2010, stock price decline

13   was STEC's disclosure that, not only had IBM failed to commence volume

14   production during the second half of 2009, but also, that STEC had no expectation

15   of IBM commencing volume production at any specified time in the future.

16        252.   Thus, a Reuters report on STEC issued on February 24, 2010, stating

17   that "the company's shares [were] down 30 percent in extended trade" also

18   reported that "[i]ndustry watchers were anticipating an update on how customers

19   apart from EMC, like IBM Corp. were ramping in terms of using STEC's

20   products" and that Defendant Manouchehr had disclosed that "[a]ll of the other

21   customers are picking up slowly."

22        253.   The analysis presented, *supra*, regarding the Company's non-

23   cancelable inventory purchase orders shows that, one of the reasons why, even at

24   the end of 2009, IBM still was not ordering for full production was that, contrary to

25   the impression conveyed by the Offering Prospectus, at the time of its issuance, the

26   Securities Fraud Defendants had no expectations that IBM would transition toward

27   ordering for volume production during the second half of 2009.

28

### 4.   Additional Disclosure That No Other Customer Could Replace EMC Under the EMC Agreement

254.   A fourth substantial cause of the February 24, 2010, stock price decline was STEC's additional disclosure that none of its other customers, singly or even taken together, were capable of duplicating the kind of purchasing made by EMC under the EMC Agreement.

255.   Thus, in its February 23, 2010, report on STEC, Deutsche Bank stated that "[i]t sounds like IBM and other customers are ramping modestly, but for now, *these customers will not be enough to offset lost EMC biz.*"

256.   Similarly, in the first sentence of its February 24, 2010, report on STEC, Needham stated, "the company remains heavily levered to pulls from its first and primary customer," and in the next sentence, Needham added that "the remaining customers [are] far behind in their own ramps."

### 5.   Disclosure That The Securities Fraud Defendants Inflated STEC's 2009 Second Quarter Revenue and Revised Revenue Guidance

257.   A fifth substantial reason for the February 24, 2009, decline in the price of STEC's stock was its issuance of revenue guidance for the 2010 first quarter -- $33 million to $35 million – that was far below investors' expectations. A February 24, 2010, *Associated Press* article stated "shares of Stec Inc. plunged Wednesday after the maker of data storage devices said first-quarter revenue would be as much as 53 percent lower than what Wall Street expected." A *Barron's* article by Eric Savitz also published on February 24, 2010, was titled "STEC Wreck: Mass Downgrades on Rotten Guidance." The reason for this decline was that revenue for the several preceding quarters had been artificially high. Revenue for the 2009 third and fourth quarters had been boosted by the one-off EMC Agreement.

258.   While it has taken until 2010 to understand that multiple reasons why STEC's 2010 first quarter guidance was, to use *Barron's* term, "rotten," even at the time when the guidance was issued, securities analysts realized that the drop in

1    revenue was caused by more than just a lack of sales to EMC, and that part of the

2    problem was a lack of credibility on the part of STEC's management.

3         259.   Thus, on February 24, 2010, a JPMorgan report stated that "the

4    *disappearance* of sustainable revenue momentum up-ended our prior view that

5    STEC was the high *growth story* in SMidCap." JPMorgan had labeled STEC "*the*

6    *high-growth story* in our coverage universe" when it had initiated coverage of

7    STEC – just one month after the Company had reported its 2009 second quarter

8    revenue.

9         260.   On February 24, 2010, a Thomas Weisel Partners research report

10   stated that "STEC's 1Q10 revenue guidance suggests to us current SSD adoption

11   in Enterprise Storage application is well below previous estimates," and that the

12   analyst was lowering its STEC stock price target because of "our loss of

13   confidence in STEC management."

14        261.   On February 24, 2010, a *Barron's* article by Alexander Eule stated

15   that "[g]iven STEC's abrupt first-quarter forecast, though, it could be a while

16   before investors take the company at its word." On the same day, another article in

17   *Barron's*, this one by Eric Savitz, noted, sarcastically, that, among those who now

18   looked "prescient" were "CEO Manouchehr Moshayedi, and his brother, president

19   Mark Moshayedi, who last summer sold 9 million shares – at $31 apiece."

20        262.   In the wake of the series of belated disclosures that demonstrated the

21   Securities Fraud Defendants' deception of the investing public, the Company (as

22   well as others) was sued by defrauded investors making well-founded allegations

23   that ultimately will cost STEC massive defense and resolution expenses, all of

24   which has been caused by the Securities Fraud Defendants' wrongdoing as alleged

25   herein.

26   **VII.   THE SEC COMPLAINT**

27        263.   On July 19, 2012, the SEC commenced the SEC Litigation against

28   Defendant Manouchehr, alleging, based on many of the facts set forth herein, that

1  he violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange

2  Act and Rule 10b-5 promulgated thereunder by engaging in a "fraudulent scheme .

3  . . [of] insider trading and made false and misleading representations and omissions

4  in connection with the sale of nine million shares of stock of STEC, Inc. in August

5  2009." SEC Complaint at ¶¶ 3, 94-99.

6       264.  The SEC's claims against Manouchehr accused him of violating

7  §17(a) of the Securities Act of 1933:

8        "by engaging in the conduct described [in its Complaint as well as herein], directly or indirectly, in the offer or sale of securities by the

9        use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

      a.  with scienter, employed devices, schemes, or artifices to defraud;

10        b.  obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order

11        to make the statements made, in light of the circumstances under which they were made, not misleading; or

12        c.  engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser."

13        SEC Complaint at ¶95.

14       265.  As Plaintiff does herein, the SEC went on to accuse him of violating

15  §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder:

16        "by engaging in the conduct described [in its Complaint as well as herein] directly or indirectly, in connection with the purchase or sale

17        of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

18        exchange, with scienter:

      d.  employed devices, schemes, or artifices to defraud;

19        e.  made untrue statements of material fact or omitted to state a material fact necessary in order to make the statements made, in light of the

20        circumstances under which they were made, not misleading; or

      f.  engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons." SEC

21        Complaint at ¶98.

22  **VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE TO EXCHANGE ACT CLAIMS**

23

24       266.  Plaintiff is entitled to a presumption of reliance under *Affiliated Ute*

*Citizen of Utah v. United States,* 406 U.S. 128 (1972), because the securities fraud

25  claims asserted herein against the Securities Fraud Defendants are predicated in

26  part upon omissions of material fact that such Defendants had a duty to disclose.

27  As more fully alleged above, the Securities Fraud Defendants failed to disclose

28

1   material information regarding STEC's business, financial results and business

2   prospects throughout the Relevant Period, in connection with the Offering and, in

3   particular, prior to at least one of Plaintiff's purchases of STEC common stock.

4       267.   In the alternative, Plaintiff is entitled to a presumption of reliance on

5   the Securities Fraud Defendants' material misrepresentations and omissions

6   pursuant to the fraud-on-the-market doctrine because:

7           (a)   STEC's common stock was actively traded in an efficient

8   market on NASDAQ before and during the Relevant Period;

9           (b)   STEC's common stock traded at high weekly volumes before

10  and during the Relevant Period;

11          (c)   as a regulated issuer, STEC filed periodic public reports with

12  the SEC;

13          (d)   before and during the Relevant Period, STEC was eligible to

14  file, and did file, registration statements with the SEC on Form S-3;

15          (e)   STEC regularly communicated with public investors by means

16  of established market communication mechanisms, including regular dissemination

17  of press releases on the major news wire services and through other wide-ranging

18  public disclosures, such as communications with the financial press, securities

19  analysts and other similar reporting services;

20          (f)   the market reacted promptly to public information disseminated

21  by STEC;

22          (g)   STEC common stock trading was covered by numerous

23  securities analysts employed by major brokerage firms who wrote research reports

24  that were distributed to the sales force and customers of their respective firms; and

25  each of these reports was publicly available and entered the public marketplace;

26          (h)   the material misrepresentations and omissions alleged herein

27  would tend to induce a reasonable investor to misjudge the value of STEC's

28  securities; and

80

(i)     without knowledge of the misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of STEC's common stock.

## IX.    NO SAFE HARBOR

268.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements alleged in this Complaint.  The statements alleged to be false and misleading all relate to historical facts or existing conditions and were not identified as forward-looking statements.  To the extent that any of the false statements alleged herein arguably may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements adequately tailored to the important factors that caused actual results to differ materially from those in the purportedly "forward-looking" statements.  Alternatively, to the extent that the statutory safe harbor would otherwise apply to any statement pleaded herein, The Securities Fraud Defendants are liable to Plaintiff for those materially false forward-looking statements because, at the time each of those forward-looking statements was made, the speaker (and, those made in the name of STEC, each of the Securities Fraud Defendants) knew the statement was false or the statement was authorized or approved by an executive officer of STEC who knew that the statement was false.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (against the Securities Fraud Defendants)

269.   Plaintiff incorporates by reference each and every allegation contained above, as if set forth herein.

270.   This claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, against each of the Securities Fraud

1  Defendants.

2       271.  During at least the Relevant Period, the Securities Fraud Defendants

3  carried out a plan and course of conduct that was intended to and, throughout the

4  Relevant Period, did: (i) deceive the investing public regarding STEC's business

5  and operations, and the intrinsic value of STEC common stock and the Company

6  generally; (ii) enable STEC insiders to sell over nine million shares of their

7  privately held STEC common stock while in possession of material adverse non-

8  public information about the Company; and (iii) cause Plaintiff to purchase STEC

9  common stock at artificially inflated prices.  In furtherance of this unlawful plan

10 and course of conduct, the Securities Fraud Defendants, jointly and individually

11 (and each of them) took the actions set forth herein either personally or as control

12 persons of STEC and its public communications.

13      272.  Each of the Securities Fraud Defendants (a) employed devices,

14 schemes, and artifices to defraud; (b) made untrue statements of material fact or

15 omitted to state material facts necessary to make the statements not misleading;

16 and (c) engaged in acts; practices, and a course of business which operated as a

17 fraud and deceit upon the purchasers of the Company's common stock in an effort

18 to maintain artificially high market prices for STEC's common stock in violation

19 of Section 10(b) of the Exchange Act and Rule 10b-5.  All of the Securities Fraud

20 Defendants are legally responsible to Plaintiff and other investors as primary

21 participants in the wrongful and illegal conduct charged herein and as controlling

22 persons.

23      273.  The Securities Fraud Defendants, individually and in concert, directly

24 and indirectly, by the use, means or instrumentalities of interstate commerce and/or

25 mail, engaged and participated in a continuous course of conduct to conceal

26 adverse material information about the business, operations and future prospects of

27 STEC as specified herein.

28      274.  The Securities Fraud Defendants employed devices, schemes, and

1   artifices to defraud, while in possession of material adverse non-public information

2   and engaged in acts, practices and a course of conduct as alleged herein in an effort

3   to assure investors of STEC's value and performance and that it would continue

4   substantial growth, which activity included the making of, or the participation in

5   the making of, untrue statements of material facts and omitting to state material

6   facts necessary in order to make the statements made about STEC and its business

7   operations and future prospects, in the light of circumstances under which they

8   were made, not misleading, as set forth more particularly herein, and engaged in

9   transactions, practices, and a course of business which operated as a fraud and

10   deceit upon Plaintiff and the other purchasers of STEC common stock before and

11   during the Relevant Period.

12       275.   Each of the Securities Fraud Defendants' primary liability and/or

13   controlling person liability under §20 of the Exchange Act, arises from the

14   following facts: (i) the Securities Fraud Defendants were high-level executives

15   and/or directors at the Company during the Relevant Period and members of the

16   Company's management team or had control thereof; (ii) each of these Securities

17   Fraud Defendants by virtue of his responsibilities and activities as a senior officer

18   and director of the Company, was privy to and participated in the creation,

19   development and reporting of the Company's internal budgets, plans, projections

20   and/or reports; (iii) each of these Securities Fraud Defendants had access to

21   members of the Company's management team, its internal reports, and other data

22   and information about the Company's finances, operations and material sales at all

23   relevant times; and (iv) each of the Securities Fraud Defendants was aware of the

24   Company's dissemination of information to the investing public which they knew

25   or deliberately disregarded was materially false and misleading.

26       276.   The Securities Fraud Defendants had actual knowledge of the

27   misrepresentations and omissions of material facts set forth herein, or acted with

28   deliberate disregard for the truth in that they failed to ascertain and to disclose such

1   facts.  Such Defendants' material misrepresentations and omissions were done

2   knowingly or with deliberate disregard for the purpose and effect of concealing

3   STEC's operating condition and future business prospects form the investing

4   public and supporting the artificially inflated price of its common stock particularly

5   in support of the Moshayedis'  and Trust Defendants' sale of STEC common stock

6   in the Offering and otherwise . As demonstrated by the Securities Fraud

7   Defendants' overstatements and misrepresentations of the Company's business,

8   operations, and earnings throughout the Relevant Period, either individually or

9   though others, the Securities Fraud Defendants, if they did not have actual

10   knowledge of the misrepresentations and omissions alleged, were reckless in

11   failing to obtain such knowledge by refraining from taking those steps necessary to

12   discover whether those statements were false or misleading.

13        277.   As a result of the dissemination of the materially false and misleading

14   information and failure to disclose materials facts, as set forth above, the market

15   prices of STEC common stock were artificially inflated before and during the

16   Relevant Period and, in particular, prior to Plaintiff's purchases of such stock.  In

17   ignorance of the fact that market prices of STEC's publicly traded common stock

18   were artificially inflated, and relying directly or indirectly on the false and

19   misleading statements made by and/or on behalf of the Securities Fraud

20   Defendants, or upon the integrity of the market in which the securities trade, and/or

21   the absence of material adverse information that was known to or deliberately

22   disregarded by the Securities Fraud Defendants but not disclosed in public

23   statements by them before and during the Relevant Period, Plaintiff  purchased

24   STEC common stock during the Relevant Period at artificially high prices and was

25   damaged thereby.

26        278.   At the time of said misrepresentations and omissions, Plaintiff was

27   ignorant of their falsity. Had Plaintiff and other investors known the truth

28   regarding STEC, which was not disclosed by the Securities Fraud Defendants,

1    Plaintiff and other investors would not have purchased or otherwise acquired their

2    STEC common stock, or, if they had acquired such common stock during the

3    Relevant Period, they would not have done so at the artificially inflated prices

4    which they paid.

5        279.   By reason of the foregoing, the Securities Fraud Defendants have

6    violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated

7    thereunder.

8        280.   As a direct and proximate result of the Securities Fraud Defendants'

9    wrongful conduct, Plaintiff suffered damages in connection with his purchases of

10   the Company's common stock during the Relevant Period.

11                                  **COUNT II**

12

13          **Violation of Section 20(a) of the Exchange Act**
            **(against the Securities Fraud Defendants)**

14       281.   Plaintiff repeats and re-alleges each and every allegation contained

15   above as if fully set forth herein.

16       282.   The Securities Fraud Defendants were controlling persons of STEC

17   within the meaning of Section 20(a) of the Exchange Act as alleged herein. By

18   virtue of their high-level positions, their ownership and contractual rights,

19   participation in and awareness of the Company's operations, and intimate

20   knowledge of the fraudulent scheme and the false financial statements filed by the

21   Company with the SEC and/or disseminated to the investing public, the Securities

22   Fraud Defendants had the power to influence and control, and did influence and

23   control, directly or indirectly, the decision-making of the Company, including the

24   content and dissemination of the various statements that Plaintiff contends are false

25   and misleading. The Securities Fraud Defendants were provided with, or had

26   unlimited access to, copies of the Company's reports, press releases, public filings,

27   and other statements alleged by Plaintiff to be misleading prior to and shortly after

28   these statements were issued and had the ability to prevent the issuance of the

1   statement or cause the statements to be corrected. Additionally, they each had

2   access to the EMC Agreement as well as all material sale data and projections with

3   respect to future sales.

4        283.   In particular, each of the Securities Fraud Defendants had direct and

5   supervisory involvement in the day-to-day operations of the Company, and

6   therefore, is presumed to have had the power to control or influence the particular

7   transaction giving rise to the securities violations as alleged herein, and exercised

8   the same.

9        284.   In committing the wrongful acts alleged herein, the Securities Fraud

10  Defendants have pursued, or joined in the pursuit of, a common course of conduct,

11  and have acted in concert with and conspired with one another in furtherance of

12  their common plan or design. In addition to the wrongful conduct herein alleged as

13  giving rise to primary liability, the Securities Fraud Defendants further aided and

14  abetted and/or assisted each other in breaching their respective duties.

15       285.   During all times relevant hereto, the Securities Fraud Defendants

16  collectively and individually initiated a course of conduct that was designed to and

17  did deceive the investing public, including shareholders of STEC, regarding the

18  management of STEC's operations, the Company's health and stability, and its

19  future business prospects that had been misrepresented by the Securities Fraud

20  Defendants prior to and throughout the Relevant Period.  In furtherance of this

21  plan, conspiracy, and course of conduct, the Securities Fraud Defendants

22  collectively and individually took the actions set forth herein.

23       286.   The Securities Fraud Defendants engaged in a conspiracy, common

24  enterprise, and/or common course of conduct during the Relevant Period.   During

25  this time, as set forth above, they caused the Company to conceal the fact that

26  STEC was misrepresenting its business prospects, revenues and income and was

27  not disclosing other material facts relevant thereto.

28       287.   The Securities Fraud Defendants accomplished their conspiracy,

1    common enterprise, and/or common course of action by causing the Company to

2    purposefully, recklessly, or negligently release false statements of material fact or

3    fail to disclose other facts necessary to make the statements made not misleading.

4    Each of the Securities Fraud Defendants was a direct, necessary, and substantial

5    participant in the conspiracy, common enterprise, and/or common course of

6    conduct complained of herein.

7        288.   Each of the Securities Fraud Defendants aided and abetted and

8    rendered substantial assistance in the wrongs complained of herein. In taking such

9    actions to substantially assist the commission of the wrongdoing complained of

10   herein, each of them acted with knowledge of the primary wrongdoing,

11   substantially assisted the accomplishment of that wrongdoing, and was aware of

12   his overall contribution to and furtherance of the wrongdoing.

13       289.   As set forth above, the Securities Fraud Defendants each violated

14   §10(b) of the Exchange Act and Rule10b-5 promulgated thereunder by their acts

15   and omissions as alleged in this Complaint.  By virtue of their positions as

16   controlling persons and otherwise, the Securities Fraud Defendants are liable to

17   Plaintiff pursuant to §20(a) of the Exchange Act.  As a direct and proximate result

18   of the Securities Fraud Defendants' wrongful conduct, Plaintiff suffered damages

19   in connection with his purchases of the Company's common stock during the

20   Relevant Period.

### COUNT III

**Breach of Fiduciary Duty**
**(Derivatively on Behalf of STEC, and against the Officer/Director**
**Defendants)**

22       290.   Plaintiff repeats and re-alleges each and every allegation contained

above as if fully set forth herein.

25       291.   Plaintiff brings this claim derivatively on behalf of STEC pursuant to

Rule 23.1(b) of the Federal Rules of Civil Procedure and California substantive

law.  Plaintiff is currently and has been a shareholder of STEC at the time of most

1   of the wrongful acts of the Securities Fraud and other Defendants as alleged herein
2   and continuously thereafter.  This is not a collusive action to confer jurisdiction
3   that the Court would otherwise lack. As alleged more fully *infra,* efforts by
4   Plaintiff to obtain relief on behalf of the Company from the Board have been
5   unsuccessful since the directors of STEC, in breach of their duty of loyalty to the
6   Company and its shareholders and waste of STEC's assets, while beholden to
7   Defendants Manouchehr and Mark, rejected Plaintiff's pre-suit demands that they
8   and others who caused STEC to be damaged, be sued. Moreover, each of the
9   members of STEC's Board, while purporting to "investigate" Plaintiff's demands,
10  were themselves personally liable to purchasers of STEC common stock sold in the
11  Offering pursuant to the Securities Act and otherwise and thus breached their duty
12  of loyalty to STEC and put their own personal interests before those of the
13  Company and its shareholders. In addition, each of the members of the Board that
14  purportedly investigated and considered Plaintiff's pre-suit demands were already
15  named as defendants in various shareholder derivative suits and, in the case of the
16  Moshayedis, were named as Defendants in the Securities Litigation, were subject
17  to being named as Defendants therein and/or were subject to claims by the SEC for
18  violations of the Securities Act and the Exchange Act.

19      292.   Although Plaintiff made a written pre-suit demand upon STEC's
20  Board of Directors on August 10, 2010 (Exhibit "A" hereto) to commence
21  litigation against those who had caused damages to the Company as described
22  herein, he never conceded (nor does he now concede) that the Board was ever dis-
23  interested or independent with respect to his letter. Plaintiff's counsel stated in
24  their Demand Letter:

> "This letter is being sent solely for the purpose of giving STEC the
> opportunity to commence the demanded litigation itself in the first
> instance. Each of you is personally implicated in the alleged
> wrongdoing by, *inter alia,* your personal culpability in connection
> with the wrongdoing alleged above and/or your failure to cause STEC
> to appropriately pursue all of its claims  against the Senior Officers,
> PWC and others who have caused it harm arising from the matters
> referred to herein. The demands set forth in this letter have been made

because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced in connection with the claims referred to herein had no pre-suit demand been made."

293.    On September 9, 2010, a lawyer, Patrick E. Gibbs, Esquire, who said he represented STEC and the entire Board, wrote to Plaintiff's counsel stating that, in response to the Demand Letter: "The Board is in the process of evaluating the issues raised in [the Demand Letter] and will respond as soon as reasonably practicable." In fact, the Board did no such evaluation nor did it have legal counsel to assist it in any such evaluation. Instead of the Board "evaluating the issues raised," as Mr. Gibbs falsely represented was ongoing, Defendants Manouchehr and Saman, apparently with the assistance of Mr. Gibbs, created a sham committee of purportedly "independent members of the Board" to create a pretext for rejection of Plaintiff's demands.

294.    Ultimately, as orchestrated by Defendants Manouchehr and Saman, Plaintiff's demands were rejected *in toto*. See letter from Defendant Saman to Plaintiff's counsel dated December 17, 2010 attached hereto as Exhibit "B." Despite the fact that independent legal counsel should have been consulted by the Board and/or the purportedly "independent members of the Board" in addressing the Demand Letter, none was retained.

295.    Thereafter, on April 23, 2012, Plaintiff's counsel, by letter of such date (Exhibit "C" hereto), asked Defendant Saman a number of questions regarding the procedures followed by the Board in connection with, *inter alia*, the demands made by Plaintiff and their ultimate rejection:

"Additionally, I have a number of questions relating to the identity and purported actions of those whom you have referred to as the 'independent members of the [Company's] Board' ('Members'). Specifically, who are such Members?  Please provide me with copies of any Board resolutions dealing with their appointment and their subsequent action rejecting the demands made as set forth in the Demand Letter. Moreover, I would appreciate answers to the following:
1.    Have any other demands been made on the Company's Board substantive similar to the Demand Letter? If so, please provide me with a copy of each such demand.

2.    What criteria were used by the Board to determine which of its members were appointed "to determine the appropriate action to be taken with respect to the" Demand Letter?

3.    Who participated in the determination of such criteria?

4.    Were there any factors or facts that the Board considered that served to disqualify any individual director from being appointed by the Board "to determine the appropriate action to be taken with respect to the" Demand Letter?

5.    Did the Members have unlimited authority "to determine the appropriate action to be taken with respect to the" Demand Letter and did they constitute what is generally referred to as a "special litigation committee?"

6.    Did anyone investigate each of the Members to determine whether there were any facts or circumstances that would disqualify such Members from serving?  If so, who performed such investigation and when?

7.    Your letter of December 17, 2010 refers to the Members' interviews of "several key witnesses." Which persons were interviewed and specifically by which Members. Were such interviews conducted under oath and/or with transcripts created of the interviews?

8.    Were there any such interviews taken of each member of the Company's Board and those former members who were serving during the period of the wrongdoing alleged in the Demand Letter?

9.    Were attempts made to interview former employees of the Company and/or its subsidiaries whose conduct is implicated in the wrongdoing as alleged in the Demand Letter?

10.    Have the Members of the attempted to calculate the extent of the economic and non-economic damages to the Company arising out of the acts described in the Demand?

11.    Have there been any remedial measures related to the conduct referred to in the Demand Letter?

12.    Your letter of December 17, 2010 refers to, *inter alia*, the "review of hundreds of thousands of documents and emails potentially relevant to the allegations in the" Demand Letter. Who reviewed such documents and for what purpose?

13.    Who made the recommendation that "independent legal counsel was not necessary" for the Members?

14.    Who evaluated the legal issue of whether "independent legal counsel was not necessary" for the Members?

15.    Your letter of December 17, 2010 refers to "the legal and practical difficulties of sustaining and possible claims" and the "governing legal standards." Who advised the Members as to the foregoing and what were the Members' conclusions in that regard?

16.    Did anyone advise the Members of "the legal…merits of the potential claims" as set forth in the Demand Letter? If so, whom and when?

17.    Did the Members, in purportedly considering the Company's costs of litigation against those alleged in the Demand Letter to have harmed the Company, give any consideration to the possibility that a shareholder's counsel could/would pursue such claims on a totally contingent basis?

18.    Have the Members taken any position as to whether the pending shareholder derivative litigation should be dismissed? If so, in what way was such a position documented?

296.   Defendant Saman provided no answers to the foregoing questions nor any documents that would have shed light on the Directors' actions and their ultimate rejection of Plaintiff's pre-suit demands. If anything, his unwillingness to provide Plaintiff's counsel with even a single one of the answers to the foregoing questions demonstrates the failure of the purportedly "independent members of the Board" (there were no such persons) to carry out any legitimate investigation of Plaintiff's demands. Indeed, there never was any such investigation or justifiable basis for the rejection of those demands. Rather, the "investigation" conducted under the auspices of Defendants Manouchehr and Saman and the rejection of the demands was solely for one purpose; namely, to provide to the Defendants a pretext for seeking the dismissal of a shareholder derivative suit, if one were to be brought by Plaintiff.

297.   Upon information and belief, the purported and still unidentified "independent members of the [Company's] Board" were not in the slightest independent or disinterested with respect to the Moshayedis or the wrongdoing referred to in the Demand letter. Indeed, each of such members, as well as all members of the Board at the time the Demand Letter was sent to the Board and thereafter until the demands therein were rejected, as well as Defendant Saman, were beholden to the Moshayedis and badly conflicted as actual or potential Defendants.

298.   In that regard, Defendants Saman and Manouchehr determined that there should be no independent or disinterested counsel advising the Board as to how to deal with the Demand Letter. In this way, such Defendants could maintain total control of what STEC's purportedly "independent members of the Board" were doing in response to the Demand Letter and to insure that, to the extent any documents were reviewed or persons interviewed in connection with the claimed wrongdoing, the "independent members of the Board" would not perform any such

1    investigation, even if competently and objectively done.

2        299.   In fact, upon information and belief, despite the representations of

3    Defendant Saman that the "independent members of the Board" carried out a

4    "review of hundreds of thousands of documents and emails potentially relevant to

5    the allegations in the" Demand Letter, no such review was carried out by the

6    "independent members of the Board." Similarly, despite Defendant Saman's

7    representation that interviews of "several key witnesses" took place, to the extent

8    there were any such interviews, they were not conducted objectively by anyone

9    independent or disinterested, not taken under oath and without transcripts and were

10   not taken of each member of the Company's Board, Defendant Mike, Defendant

11   Cook or any representatives of the underwriters of the Offering or of PWC. From

12   the receipt of the Demand Letter, with the assistance of Mr. Gibbs, Defendants

13   Manouchehr and Saman's primary purposes in going through the sham procedures

14   referred to above were to whitewash the wrongdoing as alleged in the Demand

15   Letter and related thereto so that Plaintiff's demands could be rejected and, as

16   indicated above, to use the sham investigation of Plaintiff's demands in the defense

17   of a potential derivative suit by Plaintiff.

18       300.   In light of the foregoing conduct on the part of Defendant Saman and

19   the members of STEC's Board, Plaintiff's pre-suit demands were rejected

20   wrongfully and warrant no credibility by the Court.

21       301.   Further, although all of Plaintiff's allegations of wrongdoing set forth

22   above are specifically or indirectly encompassed by the Demand Letter, even if not

23   individually itemized, any further specific Demand on STEC's Board in 2010 or at

24   present that the Company sue any of the Defendants named herein for any

25   wrongdoing specified herein would have been a futile gesture and therefore not

26   legally necessary. The Board of STEC was in 2010 and is at present totally

27   dominated and controlled by the Moshayedis and each member of the Board owes

28   his appointment and the benefits flowing therefrom to Defendants Manouchehr and

92

1    Mark.

2        302.   By reason of their positions as officers, directors, and/or fiduciaries of
3    STEC and because of their ability to control the business and corporate affairs of
4    STEC, the Individual Defendants owed STEC and its shareholders fiduciary
5    obligations of trust, loyalty, good faith, and due care, and were and are required to
6    use their utmost ability to control and manage STEC in a fair, just, honest, and
7    equitable manner. The Individual Defendants were required to act in furtherance of
8    the best interests of STEC and its shareholders so as to benefit all shareholders
9    equally and not in furtherance of their personal interest or benefit.

10       303.   Each director and officer of the Company owed during the Relevant
11   Period and owes to STEC and its shareholders the fiduciary duty to exercise good
12   faith and diligence in the administration of the affairs of the Company and in the
13   use and preservation of its property and assets, and the highest obligations of fair
14   dealing. In addition, as officers and/or directors of a publicly held company, the
15   director/officer Defendants had a duty to promptly disseminate accurate and
16   truthful information with regard to the Company's business.

17       304.   The members of STEC's Board, particularly Defendants Manouchehr
18   and Mark, because of their positions of control and authority as directors and/or
19   officers of STEC, were able to and did, directly and/or indirectly, exercise control
20   over the wrongful acts complained of herein, as well as the contents of the various
21   public statements issued by the Company.   Because of their advisory, executive,
22   managerial, and directorial positions with STEC, each of the officers and directors
23   of STEC named herein as Defendants had access to adverse non-public
24   information about the Company's STEC business, internal controls, conditions,
25   operations, and improper representations of STEC.

26       305.   At all times relevant hereto, each of the Individual Defendants was the
27   agent of each of the other Defendants and of STEC, and was at all times acting
28   within the course and scope of such agency.

306.   To discharge their duties, the officers and directors of STEC were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of STEC named as Defendants herein were required to, among other things –

    a.  refrain from acting upon material inside corporate information to benefit themselves;

    b.  ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

    c.  conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    d.  properly and accurately inform investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's business prospects and results;

    e.  remain informed as to how STEC conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, including the dissemination of false and misleading information to the investing public, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with the federal securities laws; and

    f.  assure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and

1    regulations.

2    307.   On February 26, 2010, just a few days after STEC informed the public

3    that certain of its officers were under investigation by the SEC, the Company

4    announced that it had terminated its existing Severance and Change in Control

5    Agreements that provided additional benefits for the members of STEC senior

6    management should they be terminated without cause or should they terminate

7    their own employment after a change in control at the Company.  These benefits

8    included so-called "golden parachutes" – a prorated annual bonus and accelerated

9    vesting of stock options – if they leave the Company within twelve months for a

10   change of control. Such changes were put into place to buy the silence and

11   cooperation of Defendant Cook and other senior executives of the Company in

12   order to protect the Moyshayedis and amounted to a potential waste of corporate

13   assets and misuse of the power of the Board under the circumstances.

14   308.   Similarly, the STEC Board and, in particular, its Compensation

15   Committee consisting of Defendants Ball, Bahri and Witte, caused STEC to pay

16   out bonuses for 2009 to Defendants Manouchehr, Mark and Cook in the amounts

17   of $772,500, $273,000 and $150,000, respectively, purportedly because they

18   "achieved all of their performance objectives" in 2009. Such bonuses were wholly

19   unjustified and a waste of the Company's assets since the members of the

20   Compensation Committee, indeed each members of STEC's Board, knew and did

21   not disclose that Defendants Manouchehr, Mark and Cook had each actively

22   manipulated the Company's earnings and projections and otherwise deceived the

23   investing public in substantial part, to facilitate the Moshayedi brothers' ability to

24   unload massive amounts of their STEC stockholdings (directly and through the

25   family trusts controlled by them) at artificially high prices.

26   309.   Each of the officer/director Defendants, by virtue of his position as a

27   director and/or officer, owed to the Company and to its shareholders the fiduciary

28   duties of loyalty, good faith, and the exercise of due care and diligence in the

1   management and administration of the affairs of the Company, as well as in the use

2   and preservation of its property and assets. The conduct of such Defendants

3   complained of herein involves a knowing and culpable violation of their

4   obligations as directors and officers of STEC, the absence of good faith on their

5   part, and a reckless disregard for their duties to the Company and its shareholders

6   that such Defendants were aware or should have been aware posed a risk of serious

7   injury to the Company.

8        310.   The members of the STEC Board breached their duties of loyalty and

9   good faith owed to the Company and its shareholders by allowing the Securities

10   Fraud Defendants to cause, or by themselves causing, the Company to

11   misrepresent its condition and business prospects, as detailed herein, and by failing

12   to prevent the such Defendants from taking such illegal actions.  In addition, as a

13   result of the Securities Fraud Defendants' illegal actions and course of conduct

14   before and during the Relevant Period, the Company is now the subject of class

15   action lawsuits that allege violations of the federal securities laws. As a result,

16   STEC has expended, and will continue to expend, significant sums of money to

17   defend against and resolve such litigation.

18        311.   Each of the Individual Defendants' actions described above were

19   knowing or reckless or grossly negligent.  These actions could not have been a

20   good faith exercise of prudent business judgment to protect and promote the

21   Company's corporate interests.

22        312.   As a direct and proximate result of the officer/director Defendants'

23   failure to perform their fiduciary obligations to the Company and its shareholders,

24   STEC was damaged and is being damaged at present. The damages to STEC

25   caused by the officer/director Defendants as set forth in this Count, which damages

26   cannot presently be determined, have been and are likely to be very substantial.

27   Each of the officer/director Defendants should be held accountable therefor.

28

## COUNT IV

### Unjust Enrichment
**(Derivatively on Behalf of STEC, and against Defendants Manouchehr, Mark and Mike Moshayedi and the Trust Defendants)**

313.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

314.   Defendants Manouchehr, Mark and Mike, while in possession of material inside information belonging to STEC about the true condition of the Company and after Defendants Manouchehr and Mark, among others, caused the dissemination of false and deceptive information to the investing public in order to artificially inflate the market prices of STEC shares, sold massive quantities of their and the Trust Defendants' STEC shares to an unsuspecting public in the Offering and otherwise.

315.   By selling their STEC shares under such circumstances and while in possession of material inside information that was misappropriated, Defendants Manouchehr, Mark, Mike and the Trust Defendants were unjustly enriched at the expense of the Company and the investing public.

316.   Plaintiff, as a shareholder and representative of STEC, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these Defendants, and each of them, together with the earnings thereupon, from their breaches of fiduciary duty and other wrongful conduct referred to herein. Plaintiff, on behalf of STEC, has no adequate remedy at law.

## COUNT V

### Violation of California Corporations Code §25402
**(Derivatively on Behalf of STEC, and against Defendants Manouchehr, Mark and Mike Moshayedi and the Trust Defendants)**

317.   Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

318.   At the time that the Moshayedis and the Trust Defendants sold their

1   STEC common stock as stated herein, by reason of their high executive and/or

2   directorship positions with STEC and/or ownership of substantial amounts of the

3   Company's shares, the Moshayedis and the Trust Defendants had access to highly

4   material information regarding the Company, including the information set forth

5   herein regarding, *inter alia*, the adverse facts concerning EMC's lower demand for

6   STEC's products and the manipulation of STEC's revenues and earnings.  At the

7   times of such sales, that information was not generally available to the public or

8   the securities markets. Had such information been generally available, it would

9   have significantly reduced the market price of STEC shares at the time the

10  Moshayedis and Trust Defendants sold their shares to an unsuspecting public.

11      319.   The Moshayedis and the Trust Defendants had actual knowledge of

12  material, adverse, non-public information and thus sold their STEC common stock

13  in California in violation of California Corporations Code §25402.

14      320.   Pursuant to California Corporations Code §25502.5, the Moshayedis

15  and the Trust Defendants are liable to STEC for damages in an amount up to three

16  times the difference between the price at which STEC common stock was sold by

17  them and the market value which STEC common stock would have had at the

18  times of their respective sales if the information known to the Moshayedis had

19  been publicly disseminated prior to such times and a reasonable time had elapsed

20  for the market to absorb the information.

## COUNT VI

### Waste of Corporate Assets
#### (Derivatively on Behalf of STEC, and against the Officer/Director Defendants)

24      321.   Plaintiff incorporates by reference and re-alleges each and every

25  allegation contained above, as though fully set forth herein.

26      322.   As a result of the misconduct described above, the Officer/Director

27  Defendants wasted corporate assets by incurring potentially hundreds of millions

28  of dollars of legal liability and/or legal costs to defend their unlawful actions as

1    alleged in the Securities Litigation and the SEC Litigation and in connection with

2    investigations related thereto.

3        323.   Moreover, the Director Defendants wasted the Company's assets in

4    rejecting Plaintiff's demands upon the Board and failing to pursue the claims set

5    forth in the Demand Letter and/or related thereto.

6        324.   As a result of the waste of corporate assets, the Officer/Director

7    Defendants are liable to the Company in an amount which cannot presently be

8    determined.

9    **XII.   PRAYER FOR RELIEF**

10   WHEREFORE, Plaintiff prays for judgment as follows:

11       **A.** Awarding compensatory damages in favor of Plaintiff against the Securities

12          Fraud Defendants jointly and severally, for all damages sustained as a result

13          of such Defendants' wrongdoing in an amount to be proven at trial,

14          including interest thereon;

15       **B.** Against all of the Individual Defendants and the Trust Defendants and in

16          favor of the Company for the amount of damages sustained by the Company

17          as a result of such Defendants' breaches of fiduciary duties, waste of

18          corporate assets, and/or unjust enrichment;

19       **C.** Determining and awarding STEC treble damages pursuant to California

20          Corporations Code §25502.5(a) for the Moshayedis' and Trust Defendants'

21          violations of California Corporations Code §25402;

22       **D.** Directing STEC to take all necessary actions to reform and improve its

23          corporate governance and internal procedures to comply with applicable

24          laws and to protect STEC and its shareholders from a repeat of the damaging

25          events described herein, including;

26       **E.** Awarding extraordinary equitable and/or injunctive relief as permitted by

27          law, equity, and state statutory provisions sued hereunder, including

28          attaching, impounding, imposing a constructive trust on, or otherwise

1    restricting Defendants' assets so as to assure that Plaintiff on behalf of STEC

2    has an effective remedy;

3    **F.** Awarding to STEC restitution from the Defendants, and each of them, and

4    ordering disgorgement of all profits, benefits, and other compensation

5    obtained by such Defendants;

6    **G.** Awarding Plaintiff his reasonable costs and expenses incurred in this action,

7    including counsel fees and expert fees; and

8    **H.** Awarding such other and further relief as the Court may deem just and

9    proper.

10    **XIII.  JURY DEMAND**

11    Plaintiff demands a trial by jury on all issues so triable.

12

13    Dated: October 22, 2012

CUNEO GILBERT & LADUCA LLP
Michael J. Flannery (SB No. 196266)
mflannery@cuneolaw.com
300 North Tucker Boulevard, No. 801
St. Louis, MO 63101
Telephone: (202) 789-3960
*AttoWillrneys for Plaintiff*

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
whitehatrdg@earthlink.net
Ilene Freier Brookler (SB No. 269422)
ibrookler@gmail.com
250 Hudson Street-8th Floor
New York, New York 10013
Telephone: (917) 495-4446

CUNEO GILBERT & LADUCA, LLP
Jonathan W. Cuneo
jonc@cuneolaw.com
Matthew E. Miller
mmiller@cuneolaw.com
507 C Street, N.E.
Washington, D.C. 20002
Telephone:  (202) 789-3960

*Attorneys for Plaintiff*

## VERIFICATION

*I, William A. Sokolowski, hereby declare as follows:*

I am a shareholder of STEC, Inc. I have reviewed the attached Complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and accepted:

_____
William A. Sokolowski

# EXHIBIT A

# GREENFIELD & GOODMAN LLC
## ATTORNEYS AT LAW
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
**Fax (212) 355-9592**
email: **whitehatrdg@earthlink.net**

## Richard D. Greenfield
*Also admitted to the Maryland*
*and Pennsylvania Bars*

August 2, 2010

Board of Directors
STEC, Inc.
3001 Daimler Street
Santa Ana, CA 92705-5812

Via FedEx: Tracking No. 8731-8307-0540

Dear Directors:

I am writing to you on behalf of my client, W. A. Sokolowski, who purchased 5,000 shares of STEC, Inc. ("STEC" or the "Company") common stock and has owned STEC shares at relevant times, which ownership continues to the present. A copy of the relevant page and portion of his stockbroker's statement showing his current ownership of STEC shares is enclosed with this letter.[1]

I am writing to you to demand that the Company sue its Chairman and Chief Executive Officer ("CEO"), Manouch Moshayedi; its President, Chief Operating Officer ("COO"), and Chief Technology Officer ("CTO"), Mark Moshayedi; and its Chief Financial Officer ("CFO"), Raymond D. Cook (collectively, the "Senior Officers") I also demand that STEC sue all those other persons or entities who have aided and abetted or otherwise participated in such wrongdoing including its purportedly independent auditor, Pricewaterhousecoopers, LLP ("PWC") and its outside legal counsel who drafted many of the documents disseminated to the public that are false and misleading in material respects.

---

[1] My client has sustained approximately $100,000 in losses as a result of the wrongdoing described herein and has "paper" losses on his remaining shares.

1

The Senior Officers knowingly engaged in various fraudulent practices to dramatically increase STEC's stock price and create a window for the Company's two most senior executives to sell more than 9 million shares of STEC stock, approximately 50% of their holdings, for proceeds in excess of $267 million. These fraudulent practices centered on the manipulation of the Company's revenue and revenue guidance to investors and the financial marketplace – key metrics that determined STEC's financial health.

On June 16, 2009 and again just one month later in July 2009, the Senior Officers caused the Company to announce a huge increase in STEC's revenue guidance. This news was a departure from STEC's prior guidance, and the stock price soared. The Senior Officers explained that the guidance increases resulted from purported growth in the Company's sales of its flagship product, Zeus, and a $120 million transaction with the Company's largest customer, EMC Corporation ("EMC") for the third and fourth quarters of 2009. The Senior Officers highlighted that the increased revenue growth and EMC transaction were indicative of future sales and growth. Such reported revenue growth was only obtained through accounting manipulations and violations of Generally Accepted Accounting Principles ("GAAP") and was intended to deceive my client and members of the investing public.

As the stock price rose to unprecedented levels, STEC's two top executive officers – its CEO and Chairman, Manouch Moshayedi, and his brother, STEC's President and COO, Mark Moshayedi – cancelled their newly-adopted SEC Rule 10b5-1 trading plans and sold 9 million shares of STEC stock through a "secondary offering." Manouch and Mark Moshayedi completed their sale at $31 per share – nearly double STEC's stock price just two months earlier. The Moshayedis unloaded their personally held shares near the all-time trading high for STEC common stock, just one month before the truth began to emerge, and reaped approximately $268 million in insider-trading proceeds.

The Senior Officers' manipulation of the Company's revenue and revenue guidance ended following the massive insider sales. As would be revealed through multiple partial disclosures beginning on September 17, 2009, STEC's purported increased revenue was derived from a single customer, in a one-time transaction that – contrary to the Senior Officers' representations – was not indicative of continuing demand for STEC's products. Following each of these announcements, STEC's stock price plummeted causing substantial losses not only to my client but to the investing public as well in massive amounts, all of which has led to litigation

2

seeking to recover such losses. Further, the Company's February 23, 2010 Form 10-K announced for the first time: "The [SEC] is conducting a formal investigation involving trading in our securities. Certain of our officers and employees, including our CEO and President, have received subpoenas in connection with the SEC's investigation." It is a foregone conclusion that the SEC will commence litigation against some or all of the Senior Officers as well as against the Company itself.

According to the Consolidated Complaint filed in *In re STEC, Inc. Securities Litigation*, Lead Case No. SACV 09-01304, filed in the United States District Court for the Central District of California (the "Class Action" and "Complaint"), the factual allegations of which are incorporated herein, thirteen confidential witnesses – including former STEC employees and customers with first-hand knowledge – confirmed the existence of the Senior Officers' deceptive business practices which were specifically designed to inflate STEC's financial results and artificially inflate its stock prices. The confidential witnesses confirmed, according to the Complaint, that the Senior Officers engaged in the following fraudulent practices to inflate STEC's stock price during the Class Period set forth in the Complaint:[2]

• "Shipping bricks": a term utilized internally at STEC to describe its common practice in which the Company ships empty packages or packages containing the wrong product, allowing STEC to immediately record revenue at the end of a fiscal reporting period for product that was not actually shipped;

• Demanding that customers accept inventory by a fiscal quarter's deadline for recording revenue regardless of that customer's actual need for STEC's products at that time;

• Shipping defective or untested product and immediately recording revenue upon shipment despite knowledge that the product was defective and untested;

• Selling product as "new" even though it contained refurbished or rejected parts;

---

[2] The Class Action was brought by the plaintiffs therein on their own behalf and on behalf of all persons and entities who purchased or otherwise acquired STEC common stock between June 16, 2009 and February 23, 2010

3

• Lying to customers about product quality, features, certifications, testing, and failure rates;

• Altering error reports before sending them to customers; and

• Manipulating accounting for revenue from the EMC contract, including by violating GAAP.

SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. The responsibility for preparing financial statements that conform to GAAP rests with corporate management as set forth in the Sarbanes-Oxley Act of 2002. Pursuant to these requirements, STEC's financial reports the Senior Officers caused to be filed with the SEC assured investors that the Company's financial statements were prepared in compliance with GAAP.

The revenue recognition employed by the Senior Officers at STEC violated GAAP because it included revenues from shipments of defective or unordered products. STEC's revenue recognition for the third and fourth quarters and the year ended December 31, 2009, also violated GAAP due to STEC's improper revenue recognition of the Company's dealings with EMC in the third and fourth quarters of 2009. Under GAAP, SEC SAB No. 104 ("SAB 104"), *Revenue Recognition,* revenue should not be recorded until it is both earned and realizable, which requires each and all of the following criteria to be met: (i) Persuasive evidence of an arrangement exists. (ii) Delivery has occurred or services have been rendered. (iii) The seller's price to the buyer is fixed or determinable. (iv) Collectability is reasonable assured. The Senior Officers caused STEC to violate at least three out of four of the SAB 104 criteria because at the time the Company recognized revenue from its EMC transactions:  (i) There was not "persuasive evidence of an arrangement"; (ii) STEC had not provided all of the required services; and (iii) STEC's prices to EMC were not fixed or determinable.

STEC's revenue recognition for the third and fourth quarters and 2009 also violated Financial Standards Accounting Board ("FASB") Codification § 605-25-25, *Revenue Recognition; Multiple-Element Arrangements; Recognition* ("§ 605-25-25") and § 605-25-30, *Revenue Recognition; Multiple Element Arrangements; Initial Measurement* ("§ 605-25-30"). Because the EMC

4

transaction was the first deal of its kind in the Company's history and because the transaction continued to change and evolve (e.g. there were no fixed prices), STEC did not have "vendor-specific objective evidence" about the product and service elements of the EMC transaction. Pursuant to § 605-25, it was improper for the Senior Officers to cause STEC to recognize revenue from the EMC transaction until, at the earliest, EMC resold the product to an end user (called "sell through").

STEC's revenue recognition for the third and fourth quarters and all of 2009 also violated FASB Codification § 605-15-25, *Revenue Recognition; Products; Recognition* ("§ 605-15-25"). Pursuant to § 605-15-25, STEC could be required to recognize revenue on a cash basis because it had: (i) increased levels of inventory in a distribution channel; (ii) a lack of visibility into a distribution channel; (iii) a new distribution channel or method; (iv) changes in marketing policies, (v) changes in customer relationships; and (vi) new technology. STEC's revenue recognition for the third and fourth quarters and all 2009 also violated FASB Codification § 605-50, *Customer Payments and Incentives,* including subtopics § 605-50-25 (*Vendor's Accounting for Consideration Given to a Customer*); § 605-50-45 (*Vendor's Income Statement Characterization of Consideration Given to a Customer (Including a Reseller)*; and § 605-50-50 (*Service Provider's Accounting for Consideration Given to a Manufacturer or Reseller of Equipment)* because, according to STEC, during 2010, in connection with the EMC transaction, STEC planned to offer customer rebates and sales-related services, but STEC's Senior Officers did not know the extent of customer rebates.

Under GAAP, STEC was required to record revenue from the EMC deal on sell through – as EMC resold STEC's products – or when EMC paid STEC with non-refundable funds, or when STEC completed all of its obligations. Nevertheless, management now admits that in the third and fourth quarters of 2009, STEC recorded the $120 million in EMC revenue on an accrual (when shipped) basis, and failed to record it on sell through, or a more appropriate basis. It appears that such improper revenue recognition prevailed it least throughout 2009 and probably in earlier periods as well. Based on the available information, the accounting manipulations and failure to comply with GAAP under the direction and/or supervision of the Senior Officers with the apparent acquiescence of PWC resulted in numerous material revenue, income and earnings/share overstatements.

The Senior Officers also failed to make certain specific material disclosures required by GAAP under the circumstances, including the following: (i) Disclosure of Contingencies at an interim date (*see, e.g.,* § 270-10-50, *Interim*

*Reporting*); (ii) Disclosure of Current Vulnerability Due to Certain Concentrations (*see, e.g.,* § 275-10-50, *Risks and Uncertainties*); (ii) Disclosure of Certain Significant Events (*id.*); and Disclosure of Significant Estimates (*see, e.g.,* § 330-10-55, *Inventory*).

By using the foregoing practices, among others, even well before the Class Period identified in the Complaint, the Senior Officers, aided and abetted by PWC, generated financial statements which they all knew or should have known were not prepared pursuant to GAAP nor audited by PWC pursuant to Generally Accepted Auditing Standards ("GAAS"). The Company has yet to re-state its financial statements so as to accurately reflect its true results of operations and financial condition through the present. Each of the Company's Directors has known and its current Directors know that such a restatement is warranted but have resisted causing the Company to do so.

Each of the Senior Officers is legally responsible as primary participants in the wrongful and illegal conduct described above and in the Complaint and/or as controlling persons of STEC. All of the Senior Officers were high-level executives and directors at the Company during the time of the wrongdoing and members of the Company's management team or had control thereof; each of them, by virtue of his responsibilities and activities as a senior officer and director of STEC, was privy to and participated in the creation, development and reporting of the STEC's internal budgets, plans, projections and/or reports; each of them enjoyed significant personal contact and familiarity with the others and was advised of and had access to other members of the Company's management team, internal reports, and other data and information about the STEC's finances, operations, and sales at all relevant times; and each of them was aware of its dissemination of information to the investing public which they knew or deliberately disregarded was materially false and misleading.

The Senior Officers each had actual knowledge of the misrepresentations and omissions of material facts referred to above, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts. The material misrepresentations and omissions caused by the Senior Officers were done knowingly or with deliberate disregard for the purpose and effect of concealing STEC's operating condition and future business prospects from my client and the investing public and supporting the artificially inflated price of its common stock. If the Senior Officers did not have actual knowledge of the misrepresentations and omissions referred to above, they were reckless in failing to obtain such

knowledge.

Just a few days after the Company announced the formal SEC investigation, it announced on February 26, 2010, that it had "terminated its existing Severance and Change in Control Agreements and entered into new Severance and Change in Control Agreements." These new agreements provided additional benefits for the Senior Officers should they be "terminated without cause" or "terminate [their own] employment for good reason" after a "change in control" at STEC. In addition to the benefits that the Senior Officers had in their previous agreements filed in 2008, which allowed certain payments if they left within 18 months of a change in control, they now have additional benefits if they leave even sooner (within 12 months of a change of control) including a prorated annual bonus and accelerated vesting of stock options. The new agreements also apparently delete the requirement that the Senior Officers wait to receive these benefits until "as soon as reasonably practicable after six (6) months and one (1) day following the Date of Termination." Thus, the Company's Board of Directors, notwithstanding the conduct described herein, looked out and sought to protect each of the Senior Officers unjustly.

Such conduct by the Senior Officers has not only subjected the Company to massive liability and defense costs in the wake of the commencement of the Class Action and possibly individual litigation but, as well, to substantial claims likely to be brought by the SEC. Further, it is not unlikely that the SEC will force the Company to make the long-overdue restatement of its financial statements, thereby subjecting it to additional private litigation and ultimate liability.

The demands made herein and the fact that they have been made should not be taken to mean that any of you is independent, dis-interested or can properly and objectively deal with such demands, which you cannot. Indeed, STEC is totally controlled by the Moshayedi family, who own, directly and indirectly sufficient amounts of the Company's shares to control it and, thus, each member of the STEC Board.

This letter is being sent solely for the purpose of giving STEC the opportunity to commence the demanded litigation itself in the first instance. Each of you is personally implicated in the alleged wrongdoing by, *inter alia*, your personal culpability in connection with the wrongdoing alleged above and/or your failure to cause STEC to appropriately pursue all of its claims against the Senior Officers, PWC and others who have caused it harm arising from the matters referred to

7

herein. The demands set forth in this letter have been made because, if they had not been, your counsel and/or counsel for the Company would seek to have dismissed any shareholder's derivative litigation that might be commenced in connection with the claims referred to herein had no pre-suit demand been made.

I look forward to hearing from you or your counsel within thirty days.

Yours truly,


Richard D. Greenfield

Enclosure
CC: Mr. W.A.Sokolowski

RDG:gw

8

# EXHIBIT B



December 17, 2010

949-476-1180
3001 Daimler Street
Santa Ana, California
92705-5812
www.stec-inc.com

**BY EMAIL AND FEDEX**

Richard D. Greenfield
Greenfield & Goodman LLC
250 Hudson Street, 8th Floor
New York, New York  10013

Re:     STEC, Inc. – William A. Sokolowski Shareholder Demand

Dear Mr. Greenfield:

As you know from previous correspondence, the Board of Directors of STEC, Inc. (the "Board") has received Mr. Sokolowski's shareholder demand letter dated August 2, 2010 (the "Demand"). In connection with the Demand, the independent members of the Board undertook to fully inform themselves regarding the allegations in the Demand in order to determine the appropriate action to be taken with respect to the Demand.

The independent members of the Board conducted an extensive review and investigation of the issues and allegations set forth in the Demand. The independent members of the Board interviewed several key witnesses with relevant knowledge of the issues and allegations contained in the Demand, and reviewed numerous relevant documents. These Board members discussed the issues raised in the Demand and considered the Demand itself at subsequent Board meetings.

In addition, the independent members of the Board availed themselves of information collected in connection with the underlying lawsuits pending in state and federal court that assert allegations similar to those asserted in the Demand, as well as information collected in connection with the formal investigation involving trading in the company's securities being conducted by the United States Securities and Exchange Commission ("SEC") (collectively, the "Underlying Actions"). The investigation in connection with the Underlying Actions included review of hundreds of thousands of documents and emails potentially relevant to the allegations in the Demand, including, for example, documents concerning the company's sales of its ZeusIOPS SSD products to its largest customer, EMC. The investigation in connection with the Underlying Actions also included interviews of approximately 17 witnesses concerning the merits, facts, and status of the Underlying Actions and the allegations in the Demand.

On July 14, 2010, the federal court in one of the consolidated Underlying Actions permitted the plaintiffs in that action to file a further amended complaint, which was filed on August 13, 2010. Accordingly, the independent Board members evaluated information obtained during the investigation into the newly alleged facts asserted in this amended complaint before determining the appropriate action to be taken with respect to the Demand.

On November 18, 2010, the independent members of the Board met to formulate a response to the Demand. They duly weighed several factors, including, among other things:

1.  Whether the claims asserted in the Demand have merit;

2.  The legal and practical difficulties of sustaining any possible claims;

3.  The costs to STEC in terms of monetary resources in pursuing any particular claim and whether the costs would be exacerbated by the likelihood of indemnification;

4.  The likelihood that, if successful, STEC would realize a significant recovery;

5.  The effect that refusal or pursuit of the claims would have on STEC's relationships with customers and suppliers;

6.  The effect that refusal or pursuit of the claims would have on the ability of STEC's officers and directors to manage the company;

7.  The effect that refusal or pursuit of the claims would have on the morale of STEC's management and entire employee base;

8.  The extent to which continued litigation would result in publicity and disclosures harmful to STEC and its stockholders;

9.  The extent to which STEC would be damaged by protracted and contentious litigation with its officers; and

10. The extent to which removing officers and/or directors from their positions would be harmful to STEC and its stockholders.

At this meeting, these Board members further duly considered the allegations made in the Demand, the governing legal standards, potentially relevant documents and other information, and the evidence and other information developed during the investigation of the Underlying Actions.

The independent members of the Board met again on November 30, 2010, to collect and consider additional information, including information that EMC had provided during the due diligence process directly to the investments banks that underwrote the secondary offering identified in the Demand. After receiving this information, they carefully considered whether any facts, evidence, or other information they had collected or reviewed during their evaluation of the Demand supported the retention of separate independent counsel. After due consideration of the legal and factual merits of the potential claims and other business considerations, the Board's independent directors unanimously determined in their business judgment that at this time:

1.  The retention of separate independent counsel was not necessary; and

2.  It is not in the best interests of STEC to pursue the claims alleged in the Demand against any of the individuals or entities mentioned in the Demand.

If you have any additional information, or if you have any questions concerning the foregoing, please feel free to contact me.

Respectfully,

Robert M. Saman
General Counsel

# EXHIBIT C

## GREENFIELD & GOODMAN LLC
### ATTORNEYS AT LAW
**250 Hudson Street**
**8th Floor**
**New York, NY 10013**
**(917) 495-4446**
**Fax (212) 355-9592**
**email: whitehatrdg@earthlink.net**

## Richard D. Greenfield
*Also admitted to the Maryland*
*and Pennsylvania Bars*

April 23, 2012

Robert M. Saman, Esquire
General Counsel
STEC, Inc.
3001 Daimler Street
Santa Ana, CA 92705

Via E-mail: rsaman@stec-inc.com

Re: STEC, Inc. Demand on Board of Directors

Dear Mr. Saman:

This letter follows up on your letter to me of December 17, 2010 in response to my
letter to the Board of STEC, Inc. (the "Company") of August 2, 2010 ("Demand
Letter").

It is my understanding that there is a pending shareholder derivative suit in federal
court in Santa Ana but that litigation has been stayed. In that regard, was the
derivative litigation stayed as a consequence of, *inter alia*, a request or demand
made by the defendants in such litigation, either formally or informally to
plaintiff's counsel?

Additionally, I have a number of questions relating to the identity and purported
actions of those whom you have referred to as the "independent members of the
[Company's] Board" ("Members"). Specifically, who are such Members?   Please
provide me with copies of any Board resolutions dealing with their appointment

1

and their subsequent action rejecting the demands made as set forth in the Demand Letter. Moreover, I would appreciate answers to the following:

      1.    Have any other demands been made on the Company's Board substantive similar to the Demand Letter? If so, please provide me with a copy of each such demand.

      2.    What criteria were used by the Board to determine which of its members were appointed "to determine the appropriate action to be taken with respect to the" Demand Letter?

      3.    Who participated in the determination of such criteria?

      4.    Were there any factors or facts that the Board considered that served to disqualify any individual director from being appointed by the Board "to determine the appropriate action to be taken with respect to the" Demand Letter?

      5.    Did the Members have unlimited authority "to determine the appropriate action to be taken with respect to the" Demand Letter and did they constitute what is generally referred to as a "special litigation committee?"

      6.    Did anyone investigate each of the Members to determine whether there were any facts or circumstances that would disqualify such Members from serving? If so, who performed such investigation and when?

      7.    Your letter of December 17, 2010 refers to the Members' interviews of "several key witnesses." Which persons were interviewed and specifically by which Members. Were such interviews conducted under oath and/or with transcripts created of the interviews?

      8.    Were there any such interviews taken of each member of the Company's Board and those former members who were serving during the period of the wrongdoing alleged in the Demand Letter?

      9.    Were attempts made to interview former employees of the Company and/or its subsidiaries whose conduct is implicated in the wrongdoing as alleged in the Demand Letter?

      10.    Have the Members of the attempted to calculate the extent of the economic and non-economic damages to the Company arising out of the acts described in the Demand?

      11.    Have there been any remedial measures related to the conduct referred to in the Demand Letter?

      12.    Your letter of December 17, 2010 refers to, *inter alia*, the "review of hundreds of thousands of documents and emails potentially relevant to the allegations in the" Demand Letter. Who reviewed such documents and for what purpose?

      13.    Who made the recommendation that "independent legal counsel was not necessary" for the Members?

14.     Who evaluated the legal issue of whether "independent legal counsel was not necessary" for the Members?

15.     Your letter of December 17, 2010 refers to "the legal and practical difficulties of sustaining and possible claims" and the "governing legal standards." Who advised the Members as to the foregoing and what were the Members' conclusions in that regard?

16.     Did anyone advise the Members of "the legal...merits of the potential claims" as set forth in the Demand Letter? If so, whom and when?

17.     Did the Members, in purportedly considering the Company's costs of litigation against those alleged in the Demand Letter to have harmed the Company, give any consideration to the possibility that a shareholder's counsel could/would pursue such claims on a totally contingent basis?

18.     Have the Members taken any position as to whether the pending shareholder derivative litigation should be dismissed? If so, in what way was such a position documented?

I look forward to hearing from you.

Sincerely yours,

/s/

Richard D. Greenfield

CC: Mr. William Sokolowski

RDG:gw

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

CIVIL COVER SHEET

| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐) | **DEFENDANTS** |
|---|---|
| WILLIAM A. SOKOLOWSKI, individually and derivatively on behalf of STEC, INC., | MANOUCHEHR MOSHAYEDI<br><br>(additional defendants listed on Addendum) |

| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Michael J. Flannery, Cuneo Gilbert & LaDuca, LLP, 300 North Tucker Boulevard, No. 801, St. Louis, MO 63101<br>(202) 789-3960 (additional attorneys listed on addendum) | Christopher W. Johnstone<br>Latham and Watkins, 505 Montgomery Street, Suite 2000<br>San Francisco, CA 94111; 415-391-0600<br>(additional attorneys listed on addendum) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No   ☐ **MONEY DEMANDED IN COMPLAINT: $** _____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

15 USC §§ 78j and 78t(a)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 463 Habeas Corpus-Alien Detainee | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 465 Other Immigration Actions | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | IMMIGRATION |

**FOR OFFICE USE ONLY:** Case Number: _SACV12-1862 DOC(MLGx)_

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): 2:10-cv-00667-JVS-MLG, 8:09-cv-01304-JVS -MLG

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New Jersey |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange, Los Angeles<br>(see addendum listing county of residence of each defendant) | Santa Clara, San Francisco, Madera<br>(see addendum listing county of residence of each defendant) |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): *Michael H Cannery*   Date October 22, 2012

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

**WILLIAM A. SOKOLOWSKI v. MANOUCHEHR MOSHAYEDI, et al.,**
**Addendum to Civil Cover Sheet**

**Part 1(a)**
**Additional Defendants:**

MEHRDAD MOSHAYEDI, RAYMOND D. COOK, RAJAT BAHRI, ROBERT
M. SAMAN, MASOUD MOSHAYEDI, DAN MOSES, F. MICHAEL BALL,
MATTHEW WITTE, CHRISTOPHER COLPITTS, ROBERT M. SAMAN,
MEHRDAD MOSHAYEDI TRUST, MANOUCH MOSHAYEDI TRUST and
MASOUD MOSHAYEDI TRUST

**Part 1(b)**

**Additional Plaintiff's Attorneys:**

GREENFIELD & GOODMAN, LLC
Richard D. Greenfield
whitehatrdg@earthlink.net
Ilene Freier Brookler (SB No. 269422)
ibrookler@gmail.com
250 Hudson Street-8th Floor
New York, New York 10013
Telephone: (917) 495-4446

CUNEO GILBERT & LADUCA, LLP
Jonathan W. Cuneo
jonc@cuneolaw.com
Matthew E. Miller
mmiller@cuneolaw.com
507 C Street, N.E.
Washington, D.C. 20002
Telephone:  (202) 789-3960

**1(c) Additional Attorneys for Defendants:**

Carolyn A Dawes, Michele D Johnson
LATHAM & WATKINS LLP
650 Town Center Drive 20th Floor
Costa Mesa, CA 92626
714-540-123

Patrick E Gibbs
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA 94025
650-463-4696

**IX(b) – counties believed to be the counties of residence of each defendant, based on
Plaintiffs' public records research:**

MANOUCHEHR MOSHAYEDI (Orange), MEHRDAD MOSHAYEDI (Orange), RAYMOND
D. COOK (Los Angeles), RAJAT BAHRI (Santa Clara), ROBERT M. SAMAN (Orange),
MASOUD MOSHAYEDI (Orange), DAN MOSES, F. MICHAEL BALL (Madera),
MATTHEW WITTE (Orange), CHRISTOPHER COLPITTS (san Francisco), ROBERT M.
SAMAN (Orange),  MEHRDAD MOSHAYEDI TRUST (Orange), MANOUCH MOSHAYEDI
(Orange), TRUST, MASOUD MOSHAYEDI TRUST (Orange), STEC, INC. (Orange)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Marc Goldman.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1862 DOC (MLGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| **312 N. Spring St., Rm. G-8** | **411 West Fourth St., Rm. 1-053** | **3470 Twelfth St., Rm. 134** |
| **Los Angeles, CA 90012** | **Santa Ana, CA 92701-4516** | **Riverside, CA 92501** |

Failure to file at the proper location will result in your documents being returned to you.

_____

CV-18 (03/06)     NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY